Richard B. KAY, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

No. 24495.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 13, 1970.

Decided Oct. 28, 1970.

Bazelon, Chief Judge, concurred and
filed an opinion.

Mr. Richard B. Kay, petitioner, pro se.

Mr. Richard R. Zaragoza, Counsel, Federal Communications Commission, with whom Messrs. John H. Conlin, Associate General Counsel, Federal Communications Commission, and Howard E. Shapiro, Atty., Department of Justice, were on the brief, for respondents. Mr. Henry Geller, General Counsel, Federal Communications Commission, at the time the record was filed, also entered an appearance for respondent Federal Communications Commission. Mr. George Edelstein, Atty., Department of Justice, also entered an appearance for respondent United States of America.

Before BAZELON, Chief Judge, and TAMM and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

This is an appeal from a Federal Communications Commission (FCC) ruling issued on July 15, 1970 which decided that certain broadcasting stations in Ohio properly rejected petitioner's request for equal time under section 315 (a) of the Communications Act [1] during the 1970 primary election in Ohio to choose nominees to run in the general election in November for the office of United States Senator from that state.

At the primary election scheduled to be held on May 5, 1970, the principal opposing candidates whose names were printed on the primary ballot in the Republican primary were Governor Rhodes and Congressman Taft; in the Democratic primary, Messrs. Metzenbaum and Glenn; and in the American Independent Party (AIP) [2] primary, Richard B. Kay, the petitioner here, who was unopposed *on the ballot*. In addition, in the AIP primary, one person who had *not* filed for the nomination as required by Ohio

---

1. *Candidates for public office; facilities; rules*

(a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided*, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is hereby imposed upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—

(1) bona fide newscast,
(2) bona fide news interview,
(3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or
(4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),

shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news, interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

47 U.S.C. § 315(a) (73 Stat. 557) (1964).

2. The American Independent Party had achieved a place on the Ohio ballot in the 1968 general election under a decision of the United States Supreme Court in which former Governor George C. Wallace of Alabama was successful in having his slate of Presidential electors placed on the ballot for the general election. The 467,495 votes received by the electors of the American Independent Party for the offices of President and Vice President established the party in the state sufficiently to create it as a recognized party for the 1970 elections. In that election the Nixon electors received 1,791,014 votes and the Humphrey electors received 1,700,586 votes. (Statistics from Secretary of State, Ohio.) *See generally*, Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

statutes, and whose name would not be printed on the ballot, had declared himself as a "write-in candidate" under a permissible section of the Ohio election law.[3]

Prior to the date of the primary election a number of TV and radio stations in Ohio announced that they would sponsor two programs in the two weeks before election. One program was scheduled to be held on April 24th to which all candidates in the primary running for the nomination for United States Senator on the Democratic Party ticket were invited by the stations to appear. The second program was scheduled for May 2nd and all similar candidates on the Republican Party ticket were similarly invited to appear. No similar TV or radio program for the Senate candidates of the AIP Party was announced by any of the Ohio stations which had announced the programs for the candidates on the Democratic and Republican tickets.[4]

When the invitations of the broadcasting stations to the Republican and Demo-

cratic Senate candidates became known to him, petitioner Kay on April 21, 1970 sent letters to a number of the TV and radio stations which were sponsoring the programs, or proposed to run the tapes of such programs, for the Democratic and Republican candidates and requested them to "make available to [him], before the primary election, *equal time* and use of the facilities of the various stations that are or will be involved."[5] Petitioner asserted that his request was based upon "the Equal Time and Fairness Doctrines set forth in the United States Code." Petitioner received replies to his April 21st request from only a few stations and so on April 28th he sent a second letter in which he raised the fairness issue more sharply. Therein he pointed out that all the Democratic candidates on the April 24th programs expressed views which were opposed to his on the President's announced position on the My Lai court martials, which he termed "a particular important issue of a controversial nature."[6] He also indicated that he was referring the matter

3. Page's Ohio Rev.Stat. § 3513.041 (Supp. 1969).

4. Petitioner's letter to the broadcast stations stated that he was "running unopposed in the May primary election." *See* n. 5, *infra.*

5. Petitioner Kay's request in full follows:

April 21, 1970
To all TV and Radio Stations in Greater Cleveland:
Attention: Program Director
The City Club of Cleveland is sponsoring two programs during the next two weeks. One will be held on April 24th to which all Democratic Candidates for the United States Senate have been invited to appear. The Second will be held on May 2nd to which all Republican Candidates have been invited to appear, who are running for United States Senator.
I am a candidate for United States Senator on the American Independent Party Ticket, running unopposed in the May Primary Election. The City Club has not invited me to appear on any program during the Primary Election.
It is also my understanding that local Radio and TV Stations will be present and will record both the April 24th and May 2nd programs for either live broad-

cast or re-broadcast at some subsequent date and time. I also understand that these tapes will be made available to other TV Stations and Radio Stations in other parts of the State.
In view of the Equal Time and Fairness Doctrines set forth in the United States Code I would like to request that you and all stations that make use of your tapes make available to me, before the primary election, equal time and use of the facilities of the various stations that are or will be involved.
Please advise by return mail your decision on this request.
Yours sincerely,
Richard B. Kay
Candidate for United States Senator
American Independent Ticket
416 Engineers Building
Cleveland, Ohio 44114
241–8193

6. The April 28, 1970 letter follows:
To: Program Directors of all TV and and Radio Stations in the Greater Cleveland Area
In response to my form letter of April 21st sent to all TV and Radio Stations in the Greater Cleveland Area I received five answers. It appears that all stations that carried part of the first City Club Debates that took place on April

to the FCC, and he did so by letter also dated April 28, 1970.[7] The FCC in a letter to petitioner dated July 15, 1970 ruled against his requests under "the equal opportunities" provision of section 315 of the Communications Act, the fairness doctrine, and discrimination in news coverage. With respect to petitioner's claim under section 315, the FCC ruling stated:

\* \* \* \* \* \*

The Commission has held that primary elections or conventions held by one party are to be considered sepa-rately from the primary elections or conventions of other parties. Therefore, "equal opportunities" need only be afforded legally qualified candidates for nomination for the same office in the same party's primary or nominating convention. The Commission believes that Congress, in enacting Section 315 of the Communications Act, intended to assure equality of broadcasting opportunities only to candidates competing with each other in the same contest. See Q & A V3, Public Notice of April 27, 1966, "Use

24th wrote, except WEWS did not answer. All of the answers indicated that it was the opinion of the writers that I was not entitled to equal time and refused my request for equal time under the Equal Time and Fairness Doctrines. I attended the debate on April 24th and found that all four candidates expressed an opposing view on "a particular important issue of a controversial nature" than my own.

In response to a question pertaining to the My Lai incident all four candidates upheld the President's order to go ahead with a courts martial of Lt William Calley and others. I do not uphold the President's decision in this regard and request by this letter equal time as a responsible person to present the other side of this issue.

Since the Primary Election is May 5th it will be difficult to be granted this time by that time but I make this request and ask that it be granted so that I can appear before Primary Day.

Because you have denied my previous request for equal time I am sending a copy of this request direct to the FCC so that they can take action as soon as possible.

 Yours sincerely,
 Richard B. Kay
 Candidate for United States Senator
 American Independent Party
 416 Engineers Building
 Cleveland, Ohio 44114
 241–8193

7. Petitioner's letter to the FCC follows:
 April 28, 1970
Mr. William B. Ray, Chief
Complaints and Compliance Division
Broadcast Bureau
1919 "M" Street
Washington, D. C. 20554

Dear Mr. Ray,
 This letter is to officially file another complaint after the first complaint sent to you in my letter of April 21st.

Enclosed is a copy of a form letter dated April 21st that I sent out to all TV and Radio Stations in the Greater Cleveland Area. In response to this form letter I received five replies from WVIZ-TV, WKYC-TV and Radio, WGAR-Radio and WJW-TV and Radio. In all replies they denied me the requested time. WEWS-TV used prime time to play back the entire debate of May 24th and did not answer my request at all.

I have sent the enclosed form letter dated April 28th to the same stations as the first letter of April 21st. Since Primary Day is May 5th I am not waiting until I receive answers from this letter but am sending the complaint to you with the thought in mind that they will deny this second request.

After the May 2nd appearance of the Republican Candidates for Senator and they have both taken public positions contrary to mine on an important issue I will send a third complaint for your attention. Hope that you will be able to move on these complaints as soon as possible.

Please advise when renewals for the above stations of their right to use the air ways will come up. Also what procedure must I take to appear and file an official complaint in opposition to their renewal.

 Yours sincerely,
 Richard B. Kay
 Candidate for United States Senator
 American Independent

of Broadcast Facilities by Candidates for Public Office," 31 F.R. 6660, 6669; Letter to Henry M. Johnson, Esq., Public Notice of October 22, 1948, (28055), 4 R.R. 886. Thus, if your opponent[8] had been given free time on a broadcast facility, Section 315 would require that the station also afford you equal opportunities should you make a timely request, because you both would be competing candidates for the same office. However, since you were not a candidate for either the Democratic or Republican nomination for U. S. Senate, and since you have furnished no information to indicate that your write-in opponent "used" any broadcast facilities, Section 315 of the Communications Act is not applicable in this case.

\* \* \* \* \* \*

With respect to his claim under the fairness doctrine the FCC ruled:

The principal controversial issues of public importance involved in your complaint appear to have been the contests for the Republican and Democratic nominations for the United States Senator from Ohio and the issues surrounding these contests; i. e., which candidate would best represent the party whose nomination he was seeking. Since choices of spokesmen on these issues are within licensees' discretion, since you were not a candidate for either the Democratic or Republican nomination for Senator, and since you have not shown that the presentation of your view on the issues (as to choice of candidates to represent the Republican and Democratic parties) was necessary in order to achieve fairness during the coverage of the primary campaigns of the Democratic and Republican parties, it appears that the television and radio stations referred to in your complaint did not act unreasonably in their decisions to deny your requests for broadcast time under the fairness doctrine.

With respect to issues regarding the Viet Nam War, the My Lai incident, and other such matters of public importance which may have been discussed by the Republican and Democratic candidates, you have not shown that any station in its overall programming has failed to present contrasting views on these issues. As indicated above, the methods of presenting these views are within the discretion of the licensees.

The FCC ruling also denied petitioner's claimed discrimination in news coverage[9] after noting the nature of the strong proof required for such showing and asserting "You have not supplied such information and, therefore, no Commission action is warranted at this time."

The only contention made by petitioner on this appeal is that the FCC ruling of July 15, 1970 violates section 315(a) of the Communications Act.[10] This statute, he asserts, is not ambiguous but is simple and straightforward. He particularly points to the words "candidate" and "public office," as used in the statute,

---

8. Petitioner's "write-in" opponent.

9. Petitioner had complained that the stations suppressed all information about his candidacy and discriminated against him by refusing to carry news concerning his campaign. The FCC replied that such charge involved the news judgment of the licensee as to what was newsworthy, and indicated it would not attempt to substitute its judgment of news value for that of the licensee, nor inquire into such matters unless it receives significant extrinsic evidence of deliberate distortion or slighting of news. In some situations a deserving candidate may well suffer in his campaign by being afforded the silent treatment by the media or significant portions of it. We are not unmindful of the likelihood of such conduct but we see no evidence here that the lack of publicity of petitioner's primary campaign resulted from anything other than a legitimate appraisal by the stations involved of the news value inherent in his campaign at that stage of the contest. As late as April 21st petitioner had ignored his "write-in" opponent by stating in his letter to the Cleveland radio stations that he was "running *unopposed* in the May Primary Election." (Emphasis added). *See* nn. 4 and 5 *supra*.

10. Note 1 *supra*.

and argues that as such words are used in the statute "a legally qualified *candidate* for any *public office*" is not restricted to "nominees" for such office. Thus petitioner asserts that he, Governor Rhodes, Congressman Taft, Metzenbaum and Glenn were all candidates for the same ultimate office and must be dealt with accordingly under the statute and all be given "equal opportunities * * * in the use of * * * broadcasting stations." If this is not done he points to the possibility that it would permit stations to give saturation publicity to the candidates of one party during a primary election campaign to the exclusion of candidates of other parties and that such primary publicity could be so great that it would determine the ultimate winner in the general election.

▮ The Commission replies that its ruling was in accordance with the law, was reasonable and particularly that petitioner was not entitled under section 315(a) to broadcast time comparable to that afforded to candidates who were engaged in wholly separate and distinct primary contests of other parties. We agree.

### I

Section 315(a) [11] of the Communications Act of 1934 was identical to section 18 of the Radio Act of 1927.[12] One of the original purposes of the 1927 law, as stated in the congressional debates, was to prohibit radio stations from discriminating in favor of one candidate [13] and to make certain that if radio time was allowed to one candidate that his opponent or opponents would also be allowed the same privilege.[14]

When section 315 was enacted in 1934, Congress recognized that its provisions were merely general guidelines and that to enact a definitive statute to cover all circumstances would be too "burdensome and too complicated." [15] Congress accordingly reenacted the provision contained in section 18 of the Radio Act of 1927 directing the Commission to "make rules and regulations to carry [the equal opportunities provision of section 315] into effect." [16] In the Communications Act Amendments of 1952 this provision was designated as subsection (c) of section 315.[17] It is something more than the usual grant of authority incorporated in an act creating a commission and authorizing it to make ordinary rules and regulations, because the Commission as early as the Radio Act of 1927 already had authority to make regulations as it may deem necessary to carry out the provisions of the Act.[18] The Commission presently possesses the general power to "make such rules and regulations and prescribe such restrictions and conditions [as are] not inconsistent with law." [19] Under such circumstances section 315(c) amounts to a congressional direction to the FCC to recognize the importance of this particular section of the statute and to prescribe separate rules and regulations to deal with the multitudinous situ-

11. Act of June 19, 1934, ch. 652, § 315, 48 Stat. 1088.

12. Act of February 23, 1927, ch. 169, § 18, 44 Stat. 1170.

13. 67 Cong.Rec. 12502 (1926).

14. *Id.* at 12505.

15. When the bill was being considered on the Senate floor, Senator Dill of Washington, who was a member of the committee which recommended the bill and was managing the bill on the floor, remarked:
It seemed to me better to allow the Commission to make rules and regulations governing such questions as the Senator has raised [equal time for opposing political candidates] rather than to attempt to go into the matter in the bill. (Matter in brackets supplied).
66 Cong.Rec. 12502 (1926). Previously, Senator Bingham had remarked that under the bill the Commissioners "will have power to make rules, to execute them, and to pass upon them as judges." 66 Cong. Rec. 12501 (1926).

16. Act of June 19, 1934, ch. 652, § 315, 48 Stat. 1088.

17. 66 Stat. 717.

18. Act of February 23, 1927, ch. 169, § 4(f), 44 Stat. 1163.

19. 47 U.S.C. § 303(r) (1964).

ations that arise in applying it to all federal, state and local candidates for office throughout the nation. The Commission responded faithfully to this congressional mandate and on September 8, 1954 issued a Public Notice (FCC 54–1155) entitled "Use of Broadcast Facilities by Candidates for Public Office" in which was collected many of its principal determinations and rulings under section 315. This Public Notice was updated, revised and codified on October 6, 1958 [20] and April 27, 1966.[21]

In 1959 the Congress reviewed the rulings made by the Commission under section 315, recognized the "workable knowledge" possessed by the FCC to administer the general guidelines of the statute "through rules and regulations and wherever possible by interpretations" and confirmed the power in the Commission of "full flexibility and complete discretion to examine the facts in each complaint which may be filed with the Commission." [22]

■ The Commission's July 15th ruling in petitioner's case conformed to its prior rulings in similar cases and to the rules and regulations issued in the currently effective Public Notice, previously referred to, which essentially decides the issue here through two questions and answers:

"Q. If the station makes time available to candidates seeking the nomination of one party for a particular office, does section 315 require that it make equal time available to the candidates seeking the nomination of other parties for the same office?

"A. No, the Commission had held that while both primary elections or nominating conventions and general elections are comprehended within the terms of section 315, the primary elec-

tions or conventions held by one party are to be considered separately from the primary elections or conventions of other parties, and, therefore, insofar as section 315 is concerned, 'equal opportunities' need only be afforded legally qualified candidates for nomination for the same office at the same party's primary or nominating convention. The station's actions in this regard, however, would be governed by the public interest standards encompassed within the 'fairness doctrine'. (Letters to KWFT, Inc., Oct. 22, 1948, 4 R.R. 885; Socialist Labor Party of America, May 13, 1952, 11 R.R. 234; WCDL, Apr. 3, 1953; Senator Joseph S. Clark, Jan. 25 and April 13, 1962; telegram to Dr. Edward J. Leuddeke, Oct. 25, 1961; Letter to E. C. French, Oct. 28, 1964, 3 R.R.2d 811, Q. and A. V. 5; and In re WCBS-TV, Telegram of Oct. 29, 1965.)

"Q. If the station makes time available to all candidates of one party for nomination for a particular office, including the successful candidate, may candidates of other parties in the general election demand an equal amount of time under section 315?

"A. No. For the reason given above. (Letter to KWFT, Inc., Oct. 22, 1948, 4 R.R. 885.)" [23]

Such Public Notice answers the question here posed in the negative. The gist of its ruling is that the appearance on the broadcast media, prior to a primary, of candidates of one party does not entitle the primary candidates of another party to "equal opportunities" under section 315(a) because in a primary election the candidates of each political party are running against each other for the party's nomination and not against candidates of other political parties. This has been the consistent ruling of the Com-

---

20. 23 Fed.Reg. 7817 (1958); *see id.* at 7819, 7825, 7826.

21. 31 Fed.Reg. 6660 (1966); *see id.* at 6669 V.3–V.4.

22. S.Rep.No. 562, 86th Cong., 1st Sess. 12 (1959).

23. Use of Broadcast Facilities by Candidates for Public Office, 66 Fed.Reg. 6660, 6669 V.3–V.4 (1966).

mission.[24] In ruling on petitioner's request it stated:

> The Commission believes that Congress, in enacting Section 315 of the Communications Act, intended to assure equality of broadcasting opportunities only to candidates competing with each other *in the same contest.* (Emphasis added).[25]

In petitioner's attacks upon this interpretation he calls attention to the specific language of section 315(a) which refers to a "legally qualified candidate" for a "public office" and he claims that such terms do not recognize that candidates may be divided into two groups, *i. e.,* those in a primary who are candidates for the nomination, and those after the primary who are more accurately termed nominees for the office. He stresses these two points to the extreme and concludes that the FCC is legislating by the interpretation it has placed on section 315 over the years. It is of course true that the power conferred by Congress on the FCC to "prescribe appropriate rules and regulations" is limited by the further direction that these must "carry out the provisions of [section *315*]."[26] Thus, the Commission is not at liberty to depart from the fair intendment of the congressional act, as Congress made clear in the statute. But we do not consider that the Commission has overstepped its bounds, for there is a further statutory provision that petitioner's argument has not faced. We refer to the direction of the Act that the FCC "licensee" shall afford equal opportunities "to all other *such* candidates for that office."[27]

As we interpret that provision it indicates that Congress did not intend to make equal time available to "all other * * * candidates for that office." If that had been the intent of Congress, it would not have used the word "such" or it would have said "all other *legally qualified* candidates for that office." That Congress chose neither of these alternatives indicates to us that Congress intended by the language it did employ to direct a different result, to wit, to restrict the benefits of "equal opportunities" to *candidates of the same class or character* as the candidate or candidates who may have been permitted to use a broadcasting station in the first place. So construed, we conclude that those who are to be considered "such candidates" in the multitudinous different circumstances that arise in all political contests throughout the nation is a proper matter for the rules, regulations and rulings of the Commission. We also decide that the Commission conformed to the direction of Congress when it published its Public Notices previously referred to[28] and that its questions and answers set forth as V3 and V4 of its Public Notice of

---

24. *See* Mr. Arnold Petersen, 40 F.C.C. 240 (1952) ; Carbondale Broadcasting Co., 40 F.C.C. 259 (1953) ; Honorable Joseph S. Clark, 40 F.C.C. 325 (1962) ; Mrs. Eleanor Clark French, 40 F.C.C. 417 (1964). *See also* Part V of Section 315 Primer, which was updated in 1970, 24 F.C.C.2d 832, 863–65 ; KWFT, Inc., 40 F.C.C. 237 (1948), holding that permitting a candidate for nomination to run on a party ticket for United States Senate to appear on a radio station during the primary campaign did not impose an obligation on the station to provide "equal opportunities" in the general election to his opponent because the primary was a separate and distinct race.

25. FCC letter of July 15, 1970 to petitioner Richard B. Kay. When Congress first enacted § 18 of the Radio Act (now § 315), Senator Fess referred to the person requesting "equal opportunities" as "the candidate who might be running against [a candidate for the same office] *in the same election.*" (Emphasis added.) 67 Cong.Rec. 12503 (1926). A remark of this character is not of controlling significance on congressional intent but since it is not contrary to any provision of the Act, it has some weight as being an unchallenged contemporaneous construction by a Member of Congress active in the passage of the law.

26. 47 U.S.C. § 315(c) (1964).

27. 47 U.S.C. § 315(a) (1964) (emphasis added).

28. Nn. 20, 21 *supra.*

April 27, 1966 properly dispose of the issues raised by petitioner.

## II

■ While the issue is not completely free of all doubt, an added circumstance which has some persuasive weight is that Congress on two recent occasions has taken action to amend section 315 without making any change in the provisions which the Commission has interpreted so as to deny all claims similar to petitioner's in this case. And in 1959 when section 315 was amended to add the newscast provisions, Congress fully reviewed the Commission's rulings under the section, including its definition of "legally qualified candidate" and its rulings with respect to candidates in the primary of one party requesting equal time because broadcast facilities have been furnished to candidates in the primary of other parties.[29] Congress, of course, is not required to act each time a statute is interpreted erroneously [30] and legislative silence in the face of such interpretation is not necessarily equivalent to legislative approval.[31] However, a consistent administrative interpretation of a statute, shown clearly to have been brought to the attention of Congress and not

29. When the 86th Congress was considering Public Law 86–274, 73 Stat. 557, 86th Cong., 1st Sess., Sept. 14, 1959, the House committee fully reviewed the definition of a "legally qualified candidate" as promulgated in the rules and regulations of the Commission. This rule made a distinction between candidates for the nomination in the primary and candidates in the general election who may have been nominated by primary or convention. The relevant part of the FCC definition provides:

> "*Broadcasts by candidates for public office—(a) Definitions:*
>
> A 'legally qualified candidate' means any person who has publicly announced that he is a candidate for nomination by a convention of a political party or for nomination or election in a primary, special, or general election, municipal, county, state or national. * * * *"

H.R.Rep.No. 802, 86th Cong., 1st Sess. 7, to accompany H.R. 7985.

The same committee report printed in extenso as an appendix to its report the entire text of the Public Notice entitled "Use of Broadcast Facilities by Candidates for Public Office," *supra* note 23, and in the body of the report set out the Commission's two questions and answers that are above set forth in this opinion at page 13. Thus, Congress was fully informed of the Commission's regulations and its rulings thereunder which are here challenged. Thereafter Congress amended § 315(a) without in any way altering any provision thereof which would have indicated any dissatisfaction with the rules, regulations or rulings of the Commission.

A somewhat similar situation has just transpired in which Congress sought to amend § 315(a) so as to except candidates for President and Vice President from the "equal opportunities" provisions and to limit the sums certain candidates for major elective office could expend for the use of broadcasting stations in primary and general elections. Petitioner here appeared before the House committee considering this bill on June 3, 1970 in support of having the bill include primary contests. In his appearance before the committee, he called the attention of the committee to the substance of the complaint that he here presents to this court. Hearings before the Subcommittee on Communications and Power of the Committee on Interstate and Foreign Commerce, House of Rep., 91st Cong., 2d Sess. on H.R. 13721, etc., and S. 3637, June 3, 1970, pp. 57–65. The bill which Congress ultimately passed (and the President vetoed) amended § 315(a) but made no change whatsoever in the "equal opportunities" provisions. Such action under such circumstances while not conclusive, carries some persuasion that Congress adopted the rules, regulations and rulings of the FCC on this point as being, in its opinion, a satisfactory interpretation of the statute.

30. Jones v. Liberty Glass Co., 332 U.S. 524, 533–534, 68 S.Ct. 229, 92 L.Ed. 142 (1947).

31. Boys Market, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 241–242, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); Thompson v. Clifford, 132 U.S.App.D.C. 351, 361–362, 408 F.2d 154, 164–165 (1968); Fleming v. Moberly Milk Prod. Co., 82 U.S.App.D.C. 16, 27, 160 F.2d 259, 270, cert. dismissed, 331 U.S. 786, 67 S.Ct. 1304, 91 L.Ed. 1816 (1947); *see* Zuber v. Allen, 396 U.S. 168, 192–194, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

changed by it, is almost conclusive evidence that the interpretation has congressional approval.[32]

It is clear that petitioner was not contesting in the primary for the nomination against either the Republican or Democratic candidates. His contest for the nomination was only in the AIP primary where he was unopposed *on the ballot*,[33] and petitioner won the nomination overwhelmingly by a vote of 3,867 to 24. So, since petitioner ran in a separate primary race and received substantially all the votes cast, he has not demonstrated that he was prejudiced in his race for the AIP nomination by the time afforded those Senate candidates having opposition in the other two parties.

 Petitioner also contends, as previously noted, that the Commission's ruling in his case would permit broadcasting stations to give extensive free time amounting to saturation publicity only to candidates of one party during the campaign in the primary and then to refuse any time to any candidates in the general election. Under such circumstances it is argued, and we believe justifiably so, that the amount of free time afforded in the primary could determine the winner in the general election. To this argument the Commission replies

that this could not be done (if the matter were called to their attention) because under the Communications Act broadcast stations are required "to operate in the public interest" [34] and "to devote a reasonable percentage of their broadcast time to the presentation of news and programs devoted to the consideration and discussion of public issues." [35] This involves the fairness doctrine which requires stations (1) to make "reasonable provision for the discussion of controversial issues of public importance" [36] and (2) in doing so "to operate on a basis of overall fairness." [37] The Commission brief further states:

> Were a station to afford extensive time to candidates in one primary race and give little or no coverage of other races involving ultimately the same office, or having given extensive coverage to one party's primary race, a station did not cover the general election campaign involving the same race, a serious question would arise under the fairness doctrine as to the licensee's performance as a public trustee. See Office of Communication of United Church of Christ v. F.C.C., 123 U.S. App.D.C. 328, 359 F.2d 994 (1966). There is thus no merit to petitioner's contention that the Commission's ruling opens the way to this kind of program imbalance.

32. Udall v. Tallman, 380 U.S. 1, 17–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Power Reactor Development Co. v. I.U.E., 367 U.S. 396, 413–414, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Scharfeld v. Richardson, 76 U.S.App.D.C. 378, 380, 133 F.2d 340, 342 (1942); *see* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Snyder v. Harris, 394 U.S. 332, 338–340, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969).

33. On February 4, 1970, Henry Benhase filed a declaration of intent to be a write-in candidate in the primary for nomination of the AIP Party for the U.S. Senate. He paid the $50 filing fee on April 1, 1970 and hence is considered to be a "write-in candidate" from April 1st. That petitioner was unopposed was generally considered to be the case; he so de-

scribed himself in his letter of April 21st to a number of broadcast stations and five of the six stations that replied referred to his running unopposed in the AIP primary. The record here does not indicate that petitioner ever corrected their misunderstanding, if having write-in opposition makes one opposed.

34. 47 U.S.C. §§ 307(a), 309(a) (1964); Red Lion Broadcasting Co. v. FCC, *supra* note 32.

35. Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246, 1249 (1949).

36. *Id.*

37. *Id.* at 1250. Public Notice of July 6, 1964, "Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance," 40 F.C.C. 598 (1964).

We have set forth the above statement because we consider it to be a fair interpretation of the law and one with which we concur and which, considering its source, may be relied upon by candidates who may be aggrieved in this manner in the future.

We have also considered the 1969 amendments to the Ohio Election Code which allowed any voter, regardless of prior party affiliation, to vote in 1970 in the AIP primary,[38] but we consider that this does not alter our conclusion. All states provide some means for voters to switch from one party to another though the rapidity, timing and method with which this may be accomplished varies greatly with the states. In primary elections some states limit the eligible voters to registered party members and provide different means whereby a voter may change his party. Other states permit one to announce his party to the judges at the time of the party primary. Still others go so far as to permit any voter to vote in any party primary at any time without regard to past or present announced party affiliation.[39] So, considering that all Members of Congress are necessarily thoroughly familiar with the election laws of their states, competition among parties for votes in the primaries must have been thoroughly in the mind of Congress when it enacted section 315 and on those subsequent occasions when it reviewed the Commission's rulings under section 315 and considered amendments to it. It is thus not without significance in the context of the issues raised here that Congress in section 315 has elected to limit "equal opportunities" to *individual candidates* and not to confer a corresponding right upon political parties or other organizations or individuals.

It is accordingly our conclusion that the Commission ruled correctly on petitioner's complaint. We also note that petitioner, having been successful in obtaining the nomination he was seeking by a vote of 3,867 to 24 for his opponent, has not in that or any other respect demonstrated any prejudice which, if it had resulted, should under ordinary circumstances have been corrected in the primary which has now passed.

Affirmed.

BAZELON, Chief Judge (concurring):

I concur in the result. Petitioner Kay has not pressed in this court his claim that he was entitled to broadcast time under the fairness doctrine. And in the administrative proceedings, he did not raise, and the Commission did not consider, the question whether petitioner can be deemed to have "opposed" the Republican primary candidates [1] on the ground that Ohio's election laws permitted any voter, regardless of prior political affiliation, to vote in the American Independent Party primary.[2] Thus the sole question Kay has presented is whether the bare words of Section 315 require that he be granted equal time. On this point—the only issue on which I believe

38. Page's Ohio Rev. Code § 3517.016, Laws of Ohio 133, s. 24, effective October 30, 1969. SB 24 also provided:
 Section 3. In the general election held in 1969 and the primary and general election held in 1970, the American Independent Party shall be a political party meeting the requirements of sections 3517.01 and 3517.011 of the Revised Code. Sections 3517.012, 35117.-013, 3517.014, 3517.015, and 3517.016 of the Revised Code shall apply to the primary election held by that party in 1970.

39. Minnesota, Wisconsin and Alaska have the consolidated primary ballot: Minn. Stat.1969 § 203.35, subd. 7; Wis.Stat. Ann. §§ 5.13, 5.14 (primary elections), § 5.39(2) (4) (6) (Presidential primary election) (1968); Michie's Alaska Statutes, Title 15 Elections § 15.25.080 (voter who receives party primary ballot may declare party preference but is not required to do so) (1969).

1. *Compare* Use of Broadcast Facilities by Candidates for Public Office, Part V: When Are Candidates Opposing Candidates, 24 F.C.C.2d 832, 863 (1970).

2. See page 648 of the majority opinion.

it necessary or wise to express an opinion—I agree with my brethren that in these circumstances neither the language of the statute nor its legislative history compel the result Kay demands.

