Patrick L. PAULSEN, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.

No. 72–1377.

United States Court of Appeals, Ninth Circuit.

Feb. 11, 1974.

Daniel M. Sklar (argued), Lawrence K. Keethe, of Sklar, Kornblum & Coben, Los Angeles, Cal., for petitioner.

R. Michael Senkowski (argued), Gen. Counsel, John W. Pettit, Gen. Counsel, Joseph A. Mariano, Associated Gen. Counsel, F. C. C., Washington, D. C., Howard E. Shapiro, Thomas E. Kauper, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., for respondents.

## OPINION

Before MERRILL and WRIGHT, Circuit Judges, and KING,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

Early in January 1972 petitioner Pat Paulsen, a professional entertainer and

* Of the District of Hawaii.

comedian, declared himself a serious candidate for the Republican nomination for President of the United States. He was a legally qualified candidate for the nomination and initiated an active campaign. He secured a place on the ballot in the New Hampshire primary, which was to be held on March 7, 1972.

Paulsen had been employed by Walt Disney Productions, Inc. to perform in an episode of the television series, "The Mouse Factory." Because the episode was soon to be released to television stations, the producer sought a declaratory ruling from the Broadcast Bureau of the Federal Communications Commission regarding the obligations of television stations that broadcast this show to give "equal opportunities" to other candidates pursuant to § 315 of the Communications Act of 1934 [47 U.S.C. § 315].[1] The Broadcast Bureau ruled that any national television appearances by Paulsen would impose equal opportunities obligations upon broadcast licensees.

■ Paulsen requested review of this ruling, contending that "non-political" uses of the broadcast media by legally qualified candidates could not give rise to equal opportunities obligations under the statute without violating the Constitution. The FCC rejected the contention and affirmed the Broadcast Bureau's ruling, prompting Paulsen's appeal. We affirm the Commission.[2]

Two issues are presented: (1) Does "non-political" use of a broadcast station by a professional entertainer, also a legally qualified candidate for public office, constitute "use of a broadcast sta-

tion" within the meaning of § 315 of the Communications Act, giving rise to equal opportunities obligations? and (2) Does § 315 as applied by the Commission ruling unconstitutionally deny Paulsen equal protection and due process by forcing him to abandon his usual employment and livelihood in order to run for public office, other candidates for the same office not being likewise burdened?

I

■ Congress enacted § 315 to encourage full and unrestricted discussion of political issues by legally qualified candidates. Farmers Educational and Cooperative Union v. WDAY, Inc., 360 U.S. 525, 529, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959). More specifically, the purpose of the section is to require a broadcaster to treat equally all candidates for a particular office or nomination once the broadcaster has made its facilities available to any one of the candidates. McCarthy v. F. C. C., 129 U.S.App.D.C. 56, 390 F.2d 471, 473 (1968). The FCC has interpreted the phrase "equal opportunities" to mean that there must be no discrimination in rates, facilities, practices, or services rendered to candidates. Use of Broadcast Facilities by Candidates for Public Office, 35 Fed.Reg. 13048, 13060 (1970). The FCC does not, however, require a station to donate time to a candidate who cannot afford time comparable to that paid for by his opponent. Letter to M. R. Oliver, 11 P&F Radio Reg. 239 (1952).

Paulsen claims the television appearances he makes as an entertainer, from

---

1. Section 315(a) provides in relevant part:
   If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided*, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed under this subsection upon any licensee to allow the use of its station by any such candidate. . . . . 47 U.S.C. § 315(a).

2. Although Paulsen is no longer a legally qualified candidate for the Republican nomination for President, neither party suggests that this case is moot, nor do we feel it is. The FCC's ruling has a continuous and prospective effect on the relationship between Paulsen's right to qualify as a candidate and campaign for public office and his continuing status as a professional entertainer. The issues are concrete, and Paulsen's interest and that of others similarly situated warrants their adjudication. *See* Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).

which he derives a large portion of his livelihood, are absolutely non-political in nature. He has no control over their content and no opportunity to advance his political views. He claims the added television exposure does not indirectly enhance his political candidacy by making him more well-known to the public, since he is already well-known.

Paulsen's basic argument is that the imposition of equal time obligations on stations which broadcast his shows fails to serve, and indeed hinders, the purpose of § 315. Acknowledging that a literal reading of the section supports the FCC's position, he claims that the "vice" of the FCC's ruling is that its rigid and indiscriminate application to "non-political" use of broadcast stations does not further the objectives of the section.

█ The FCC responds that it must apply some strict rule regarding the application of § 315 in order to avoid the unauthorized enlargement of its involvement in broadcasting operations. Paulsen's proposed distinction between political and non-political use would, the FCC contends, require it to make highly

subjective judgments concerning the content, context, and potential political impact of a candidate's appearance. We agree.

The FCC has issued four public notices in the last 20 years in which it has consistently maintained that *any* appearance by a political candidate during non-news programming constitutes a "use" under § 315. Use of Broadcast Facilities by Candidates for Public Office, 19 Fed.Reg. 5948 (1954); 23 Fed. Reg. 7817 (1958); 31 Fed.Reg. 6660 (1966); 35 Fed.Reg. 13048 (1970). In 1959 it even applied § 315 to an appearance by a political candidate in a newscast. This prompted Congress to review the FCC's rulings on the question of what constitutes a "use" under the equal time provision. As a result of this review, Congress amended § 315 to exempt appearances in newscasts, news interviews, news documentaries, and on-the-spot news coverage.[3] At the time of this amendment, Congress fully reviewed FCC rulings under § 315, including those that held the section applicable to a candidate's appearance not in the aid of his candidacy.[4] Congress did not,

3. The Senate Committee on Interstate and Foreign Commerce recognized that this exemption provided the opportunity for a broadcaster to push his favorite candidate and to exclude others. The committee concluded, however, that the benefits to the public that flow from the unrestricted presentation of candidates on news-type programs "are so great that they outweigh the risk that may result from the favoritism that may be shown by some partisan broadcasters." Sen.Rep.No.562, 86th Cong., 1st Sess., U.S.Cong. & Adm.News 2564, 2572 (1959).

4. The FCC uses a question and answer format to clarify its interpretation of the meaning and scope of § 315. In 1958 the FCC published the following:
B. *What constitutes a "use" of broadcast facilities entitling opposing candidates to "equal opportunities"?*
4. Q. If a legally qualified candidate secures air time but does not discuss matters directly related to his candidacy, is this a use of facilities under section 315?
A. Yes. Section 315 does not distinguish between the uses of broadcast time by a

candidate, and the licensee is not authorized to pass on requests for time by opposing candidates on the basis of the licensee's evaluation of whether the original use was or was not in aid of a candidacy. (WMCA, Inc., 7 R.R. 1132.)
5. Q. Must a broadcaster give equal time to a candidate whose opponent has broadcast in some other capacity than as a candidate?
A. Yes. For example, a weekly report of a Congressman to his constituents via radio or television is a broadcast by a legally qualified candidate for public office as soon as he becomes a candidate for re-election, and his opponent must be given "equal opportunities" for time on the air. Any "use" of a station by a candidate, in whatever capacity, entitles his opponent to "equal opportunities."
(Station KNGS, 7 R.R. 1130.)
6. Q. If a candidate appears on a variety program for a very brief bow or statement, are his opponents entitled to "equal opportunities" on the basis of this brief appearance?
A. Yes. All appearances of a candidate, no matter how brief or perfunctory, are a

however, choose to exempt such appearances from § 315's scope. This, coupled with a literal reading of the language Congress uses in § 315, leads us to conclude that the FCC's failure to distinguish between political and "non-political" broadcast use by a candidate is consistent with congressional intent. *See* Kay v. F. C. C., 143 U.S.App.D.C. 223, 443 F.2d 638, 646–647 (1968).

It appears clear that Paulsen's "Mouse Factory" appearance resulted from his status as an entertainer rather than as a candidate. However, unless a clear rule exists that all broadcast use by a political candidate subjects a station to equal time obligations, broadcasters and ultimately the FCC would be forced to examine the nature of a candidate's every appearance to determine whether it falls under § 315. If the section were invoked only when political issues were actually discussed, detailed guidelines would have to be drawn to determine the precise contours of political discussion. Additionally, a station could support one candidate by inviting him or her to appear on numerous shows but strongly discouraging the discussion of political issues.[5] True, Paulsen might not benefit from such treatment if, as he says, he is already well-known to the viewing public, but a less popular and less well-exposed candidate could surely benefit from the exposure. To define such appearances as non-political is to apply a rather narrow and perhaps a bit naive definition of "political."

Section 315 is grounded in the recognition that radio and television play important roles in the election process. A candidate who becomes well-known to the public as a personable and popular individual through "non-political" appearances certainly holds an advantage when he or she does formally discuss political issues to the same public over the same media.

A more stringent standard imposing equal opportunities obligations not only when a candidate actually discusses political issues but also when the appearance is merely *prompted* by one's candidacy could be even more unworkable and require a greater degree of broadcaster and FCC involvement.

The Supreme Court recently ruled in Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U. S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), that neither the Fairness Doctrine nor the First Amendment requires a broadcaster to accept paid editorial advertising. One of the Court's concerns was that such a requirement would result in the FCC having to make day-to-day decisions concerning whether a particular individual has been given sufficient opportunity to present his viewpoint and whether a given viewpoint has already been sufficiently aired. The Court found distressing this potentially enlarged involvement of the government in broadcasting operations. *Id.* at 126–127, 93 S.Ct. 2080. *See also* Farmers' Union v. WDAY, *supra*, 360 U.S. at 528, 79 S.Ct. 1302. A similar concern in a different context exists in the case before us, a concern alleviated by adherence to the FCC's present well-defined rule.

## II

■ Paulsen argues that if his "non-political" appearances fall within the scope of § 315, the statute as applied is unconstitutional as a denial of equal protection and due process because it forces him to give up his means of livelihood

"use" of a station's facilities within section 315.

.    .    .    .    .

11. Q. If a station owner, or a station advertiser, or a person regularly employed as a station announcer were to make any appearances over a station after having qualified as a candidate for public office, would section 315 apply?

A. Yes. Such appearances of a candidate are a "use" under section 315. (Letters to KUGN, dated April 9, 1958; to KTTV, 14 R.R. 1227; and to Kenneth Spengler, 14 R.R. 1226b, respectively.)
Use of Broadcast Facilities by Candidates for Public Office, 23 Fed.Reg. 7817, 7818 (1958).

5. *See* note 3 *supra* and accompanying text.

as a television performer in order to run for office. Paulsen asserts that, unlike persons in other occupations, a professional performer who is not wealthy enough to forego work on television during a campaign is effectively eliminated from attaining public office: He could be precluded from making any television appearances solely for political purposes, and without these he could not win.

Paulsen bases his constitutional argument primarily on Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). There the Court struck down a Texas filing-fee scheme that barred candidates from running in primary elections unless they paid fees ranging from $50 to $8,900. The Texas statute applied only to party primaries, and a candidate who was unable to place his name on the primary ballot could still gain a place on the general election ballot without payment of fees by submitting a proper application accompanied by a voter petition. The Court found, however, that in certain parts of Texas the primary election may be more crucial than the general election, and it did not accept as reasonable a requirement forcing candidates and voters to abandon party affiliations in order to avoid an economically burdensome state filing fee. 405 U.S. at 146–147, 92 S.Ct. 849.

The Court held that fees of the magnitude involved fell with unequal weight on candidates and voters according to their ability to pay and that the statute had to be struck down since it was not "reasonably necessary" to accomplish a legitimate state objective. Paulsen contends the FCC's ruling also falls with unequal weight—on performers not wealthy enough to stop working during their campaigns.

While this argument has some appeal,[6] we do not agree that Bullock v. Carter compels its acceptance. In *Bullock* the Court applied neither a compelling state interest test nor a rational basis test. Rather it required that, upon "close scrutiny," the Texas filing-fee system be "reasonably necessary to the accomplishment of legitimate state objectives." 405 U.S. at 144, 92 S.Ct. at 856. Texas maintained that the fees were necessary to regulate the primary ballot and to finance elections. The Court found, though, that the fees served no rational regulatory purpose and that the state interest in saving election costs did not justify a system that excluded poorer candidates unable to pay the fees.

We find that § 315 as interpreted by the FCC, on the other hand, is both reasonable and necessary to achieve the important and legitimate objectives of encouraging political discussion and preventing unfair and unequal use of the broadcast media. The section therefore passes constitutional muster.

Affirmed.

6. *See generally* Comment, A Constitutional Remedy for the High Cost of Broadcast and Newspaper Advertising in Political Campaigns, 60 Calif.L.Rev. 1371 (1972), where the author proposes that the equal protec-

tion clause forbids broadcast licensees and newspaper publishers from discriminating in the allocation of campaign advertising on the basis of ability to pay.