### NATIONAL ORGANIZATION FOR WOMEN, et al., Appellants,

v.

### MUTUAL OF OMAHA INSURANCE CO., INC., Appellee.

American Council of Life Insurance and the Health Insurance Association of America, Amici Curiae.

No. 86–15.

District of Columbia Court of Appeals.

Argued Sept. 16, 1986.
Decided Sept. 18, 1987.

Marsha Levick, with whom Jeffrey L. Braun, Jan G. Zager, Joshua Paul, and Emily J. Spitzer, New York City, were on the brief, for appellants.

Vincent H. Cohen, with whom Peter W. Tredick, Jean S. Moore, Washington, D.C., and Lawrence F. Harr, Omaha, Neb., were on the brief, for appellee.

Dennis H. Vaughn, Patrick W. Shea, Jack H. Blaine, Edward J. Zimmerman, Joseph W. Peel, and Karen A. Clifford, Washington, D.C., were on the brief for amici curiae.

Before BELSON and TERRY, Associate Judges, and NEBEKER,[*] Associate Judge, Retired.

BELSON, Associate Judge:

The two individual appellants are women who purchased health insurance policies at rates higher than those charged men of the same age and medical history. Appellee Mutual of Omaha sold those policies to the individual appellants, who assert that by charging them the higher rates Mutual of Omaha violated the District of Columbia Human Rights Act, D.C. Code §§ 1–2501 to 1–2557 (1987). The National Organization for Women, a nationwide membership organization, joined the individual appellants in their suit and in this appeal. Because we disagree with appellants' contention that the Human Rights Act applies to insurance companies' actuarial pricing practices, we affirm the trial court's dismissal of the complaint.

I

Kathy Bonk and Vicky Morean each purchased health insurance policies from Mutual of Omaha ("Mutual"). The price of their policies was higher than that which

[*] Judge Nebeker was an Associate Judge of this court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1987.

would have been charged to men of the same age and medical history. The difference was the result of gender-based actuarial tables commonly used by insurance companies in setting rates for insurance premiums. These tables purport to assess the individual's risk to the insurance company based on the insured's gender, age, and other factors.

Bonk and Morean, joined by the National Organization for Women ("NOW"), brought suit on behalf of themselves and all women similarly situated, claiming that Mutual's practice of charging higher health insurance premiums for women violates the D.C. Human Rights Act ("the Act"). The pertinent language of the Act is as follows:

> It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based on race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, political affiliation, source of income, or place of residence or business, of any individual:
>
> (1) To deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations[.]

D.C.Code § 1–2519(a) (1987). The Act also creates a private right of action for damages and other remedies for any person aggrieved by practices prohibited by the Act. D.C.Code § 1–2556(a) (1987).

In dismissing appellants' claim, the trial court concluded that the Act did not apply to gender distinctions in insurance companies' actuarial rating practices, and consequently that plaintiffs had failed to state a cause of action upon which relief could be granted.

On appeal, appellants argue that, under the language of the Act, Mutual is a "place of public accommodations," that its insurance policies are "goods, services, facilities, privileges, advantages, [or] accommodations," and that gender-based pricing denies them and other women the full and equal enjoyment of the policies. *See* D.C. Code § 1–2519(a)(1) (1987). They therefore contend that their complaint stated a claim of unlawful discrimination under D.C.Code § 1–2556(a) (1987), and that the trial court erred in dismissing it. Mutual, on the other hand, disagrees that the statutory language requires the result appellants seek, and argues that every indication of the District of Columbia Council's intent points to the conclusion that the Council did not intend to prohibit actuarial pricing in insurance policies. We think that the better interpretation of the Human Rights Act is that it does not encompass actuarial rating practices, and therefore affirm the trial court's dismissal.

## II

It is true that it can be argued with some persuasion that the "plain language" of the Act prohibits discrimination based on gender in the services offered by insurance companies. *See* D.C.Code §§ 1–2502(24), –2519 (1987). Significantly, however, the statute contains no language purporting explicitly to regulate insurance premium practices. If the Council had intended to effect such a dramatic change in insurance rate-setting practices, it is reasonable to assume that there would have been at least some specific reference to it in the language of the Act or, at least, within its legislative history. *See Seidina, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 490, 105 S.Ct. 3275, 3282, 87 L.Ed.2d 346 (1985); *cf. State v. White,* 97 Wis.2d 193, 197–199, 295 N.W.2d 346, 348 (1980) (strong showing of legislative intent required before court would construe statute to create anomaly in established criminal procedures). Under the circumstances, therefore, we think it appropriate to look to the Act's statutory context and its legislative history to ascertain whether its scope extends to actuarial pricing practices. *See West v. Kerr-McGee Corp.,* 765 F.2d 526, 530 (5th Cir.1985) (despite statute's superficial clarity, "latent ambiguities" warrant reference to legislative history).

## III

■ The origins of the Act can be traced to 1973, when the pre-home rule District of Columbia Council enacted "A Regulation Governing Human Rights," DCRR Tit. 34 (1973) ("the Regulation").[1] Among other things, the Regulation prohibited the denial of full and equal enjoyment, based on sex or other enumerated factors, of the goods, services, facilities, privileges, advantages and accommodations of places of public accommodation. *Id.* § 15.1 (a). "Place of public accommodation" was defined to include insurance companies and establishments of insurance policy brokers. *Id.* § 3.1. In 1977, these provisions of the Regulation were incorporated into the D.C. Code as part of the Human Rights Act. D.C.Code §§ 1–2502(24), –2519 (1987).

The Committee Report on the Regulation indicated an intent to make its provisions expansive and powerful. *See* Economic Development, Labor and Manpower Committee, Report to the District of Columbia City Council (1973). The Committee announced that it had considered its "prerogative to legislate broadly," and emphasized its intent to make the Regulation both flexible and far-reaching. *Id.* at 2. Although testimony before the Committee made passing reference to legislation in other states that prohibited discrimination by insurance companies, neither the Committee Report nor other legislative history referred specifically to actuarial rating practices.

In construing a statute under circumstances such as these, courts can sometimes find guidance by reading it in conjunction with other statutes relating to the same subject matter. *White, supra,* 97 Wis.2d at 197–199, 295 N.W.2d at 348; *Ha-*

*fling v. Inlandboatmen's Union of Pacific,* 585 P.2d 870, 872 (Alaska 1978). Reference to other statutes is particularly appropriate when the statutes were enacted by the same legislative body, at the same session. *See Erlenbaugh v. United States,* 409 U.S. 239, 244, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972); *United States v. Stewart,* 311 U.S. 60, 64–65, 61 S.Ct. 102, 105–106, 85 L.Ed. 40 (1940); *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 491 n. 10 (9th Cir.1984), *cert. denied,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985).

Such is the case here. Throughout the effective period of the Regulation and at the time of its adoption as the Human Rights Act, an existing statute known as the Insurance Code allowed a maximum three-year set back for calculating life insurance premiums for women, but not for men. D.C.Code § 35–705b(d) (1973) (amended 1978). That is, life insurance companies could calculate premiums for women according to an age not more than three years younger than their actual age, due to the fact that women's life expectancies are longer than men's. *Id.* Since the insurance code clearly allows a gender-based differential in setting insurance rates, arguably in conflict with the Human Rights Act, we turn to the Act's legislative history to help resolve this conflict.

In adopting the Act, the Council did not expressly acknowledge its arguable conflict with the Insurance Code. Shortly after the Act was adopted, however, the Council requested an opinion from the Corporation Counsel as to whether life insurance setbacks violated that Act. The Acting Corporation Counsel opined that they did not. 3 Op. Corp. Counsel 184, 188 (1978). The Corporation Counsel's opinion pointed out

---

1. In 1967, Congress first established the District of Columbia Council, composed of nine members appointed by the President of the United States and approved by the United States Senate, to assume the regulatory functions previously performed by a Board of Commissioners. *See* Reorganization Plan No. 3 of 1967, 81 Stat. 948, §§ 201, 402 (1967). In December 1973, Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act, P.L. 93–198, 87 Stat. 774 (1973), granting powers of local self-government to District of

Columbia residents. *Id.* § 102(a). Under this Act, the District of Columbia Council is composed of thirteen members elected by the registered voters of the District of Columbia and has, subject to powers reserved to or excluded by Congress, the legislative power over the District of Columbia. *Id.* §§ 302, 401, 404(a); *see also id.* §§ 601–604 (reservation of Congressional authority). The powers of the Council under home rule took effect on January 2, 1975. *Id.* § 771(c).

that the Human Rights Act "does not regulate insurance premium practices, either explicitly or inferentially." *Id.* at 186. In reliance on this formal opinion, the Council increased the permissible set-back to six years. Standard Valuation and Nonforfeiture Amendments Act of 1978, D.C. Law 2–120, §§ 7(c), 8(b), 1978 D.C. Statutes at Large 334, 338 (codified at D.C.Code §§ 35–507(d)(5), (6) (1981) (amended 1985)). Thus, the Act's arguable clarity is belied by the Council's express action, only months after adopting the Act, of increasing permissible life insurance set-backs for women to six years.

It is clear that the Council did not enact the insurance set-back provisions in ignorance of their potential conflict with the Act. *Cf.* 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 51.01 (4th ed. 1984) (cannot be certain legislature cognizant of existing provisions when enacts inconsistent statute). Rather, it did so only after consulting the Corporation Counsel and expressly considering the potential impact of the Act on those provisions. In such a situation, it is proper to view the later act "as a legislative interpretation of the earlier ·act ... in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting." *Stewart, supra,* 311 U.S. at 65, 61 S.Ct. at 106; *see also Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 251–52, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984) (looking at legislative history of related later act to interpret earlier act). We should construe the two statutes to be in harmony if reasonably possible. *Chevron, supra,* 726 F.2d at 490 n. 8; 2A SINGER, *supra,* § 51.02. To do so requires us to conclude that the Council did not intend the Act to include gender-based insurance pricing within its scope. *See Nat'l Org. for Women v. Metro. Life Ins.*

*Co.,* App.Div., 516 N.Y.S.2d 934, 936–37 (1987) (concluding that New York Human Rights Law does not prohibit gender-based insurance rates in light of insurance law's prohibition against discrimination based on factors not including sex and in light of provision for gender-based age setbacks).

■ We add that the Corporation Counsel's interpretation of the Act, while not binding on this court, is entitled to great weight. *Jordan v. District of Columbia,* 362 A.2d 114, 118 (D.C.1976). This is particularly true here, where the Council knew of the Corporation Counsel's construction, did not reject that construction or negate it by amending the Act, and, in fact, relied on it in enacting subsequent legislation. *See Kay v. FCC,* 143 U.S.App.D.C. 223, 231–32, 443 F.2d 638, 646–47 (1970).

## IV

■ The Council's amendment of the Act to make specific reference to automobile insurance policies further supports our conclusion that the Council did not intend the Act to regulate the pricing of insurance policies. *See Argosy Ltd. v. Hennigan,* 404 F.2d 14, 20 (5th Cir.1968). Four years after it amended the Insurance Code's set-back provisions, the Council again addressed the issue of gender-based insurance practices in amending the Act to prohibit discrimination in the issuance, renewal or cancellation of automobile insurance policies. D.C.Code § 1–2533 (1987).[2] The amendment was limited to automobile insurance, and does not refer to discrimination in insurance rates. Even if the amendment was meant to clarify and support the Act's existing provisions, *see Dupont Circle Citizens' Ass'n v. District of Columbia Zoning Comm'n,* 431 A.2d 560, 567 n. 12 (D.C.1981), its failure to include automobile

2. The statute provides:
It is [an] unlawful discriminatory practice for an insurer authorized to sell motor vehicle insurance in the District of Columbia to do any of the following acts, wholly or partially for a discriminatory reason based on race, *color, religion,* national origin, sex, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, political affiliation, lawful occupation, or location within the geographical area of the District of Columbia of any individual:
   (1) To fail or refuse to issue a policy of motor vehicle insurance;
   (2) To fail or refuse to renew a policy of motor vehicle insurance; or
   (3) To cancel a policy of motor vehicle insurance.
D.C.Code § 1–2533 (1987).

insurance *rates* within its scope suggests the Council's view that other provisions of the Act did not encompass insurance rates. *See also Office of People's Counsel v. Public Serv. Comm'n,* 477 A.2d 1079, 1084 (D.C.1984) (statute should be construed so that general language does not apply to matters covered by more specific language, and no part of statute either redundant or superfluous).

We also note that several bills that would prohibit the consideration of gender in insurance ratemaking have been introduced in the Council in recent years. *See, e.g.,* Bill 6–32, Council of the District of Columbia (introduced Jan. 4, 1985); Bill 6–20, Council of the District of Columbia (introduced Jan. 2, 1985); Bill 5–56, Council of the District of Columbia (introduced Jan. 18, 1983). None of these bills has been enacted. While unsuccessful attempts at legislation are "not the best of guides to legislative intent," *see Bob Jones University v. United States,* 461 U.S. 574, 600, 103 S.Ct. 2017, 2032–2033, 76 L.Ed.2d 157 (1983), the Council's failure to pass rate-making anti-discrimination bills has particular relevance in interpreting the public accommodation provisions of the Act. This is not a case where the Council might have considered the bills redundant of the existing scope of the Act. On the contrary, the Council's solicitation of and reliance upon the Corporation Counsel's opinion, *supra,* shows that it declined to enact the proposed bills despite its having been informed that the Act did not cover gender-based insurance rates. *See* SINGER, *supra,* § 49.-10 at 408 ("Where ... practical and contemporaneous interpretation has been called to the legislature's attention, there is more reason to regard the failure of the legislature to change the interpretation as presumptive evidence of its correctness.").

### V

Appellants call our attention to two Supreme Court cases which have held that the use of sex-based actuarial tables in employee benefits violates Title VII of the United States Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (1982). First, in *City of Los Angeles Department of Water & Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the Court invalidated that department's requirement that female employees, because of their longer expected life span, make larger contributions to its pension plan than male employees. *Id.* at 717, 98 S.Ct. at 1380. Six years later, in *Arizona Governing Committee v. Norris,* 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983) (per curiam), the Court extended its earlier holding to prohibit employee retirement benefits which, also because of women's longer projected life spans, give lower monthly annuity benefits to women than to men. *Id.* at 1074–75, 103 S.Ct. at 3494. The Court has made clear that classifications that distinguish between male and female employees' benefits constitute sex discrimination, even if they accurately reflect objective actuarial data. *Manhart, supra,* 435 U.S. at 710, 712–13, 98 S.Ct. at 1376, 1377–78.

*Manhart* and *Norris* prohibit gender-based pricing where health insurance is offered as an employee benefit. *See Norris, supra,* 463 U.S. at 1089, 103 S.Ct. at 3502 (employer that adopts fringe-benefit scheme that discriminates on the basis of sex violates Title VII, despite role of third party insurance company). Employee benefits clearly are covered by Title VII. Given our conclusion, however, that the Human Rights Act does not purport to regulate actuarially-based insurance rates within its anti-discrimination provisions, the holdings in *Manhart* and *Norris* do not apply in this case.

Finally, it is worth emphasizing that this holding deals not with what the Council can do or ought to do regarding the use of classifications in setting insurance rates, but only with what it has done. Based upon the language of the Human Rights Act and related legislation, and upon legislative history, we conclude that the Council has not proscribed the use of gender-based categories in setting insurance rates.

*Affirmed.*

TERRY, *Associate Judge,* concurring:

I join in affirming the trial court's dismissal of the complaint, but solely on the

ground that "the Council's solicitation of and reliance upon the Corporation Counsel's opinion ... shows that it declined to enact the proposed bills despite its having been informed that the Act did not cover gender-based insurance rates." *Ante* at 279. I also agree with part V of Judge Belson's opinion. However, I specifically do not agree with the view that "the better interpretation of the Human Rights Act is that it does not encompass actuarial rating practices...." *Ante* at 276. As the majority recognizes in the very next sentence, there is "some persuasion" in appellants' argument to the contrary; indeed, I find it quite persuasive. Were it not for what I regard as clear evidence of legislative intent, I would probably vote to reverse.