William H. BRANCH, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and the United States of
America, Respondents,

American Legal Foundation, Consumer
Federation of America, et al.,
Intervenors.

No. 86–1256.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 10, 1986.

Decided July 21, 1987.

Robert L. Corn, with whom Marvin J. Diamond, Washington, D.C. was on the brief, for petitioner.

C. Grey Pash, Jr., Counsel, F.C.C., with whom Jack D. Smith, General Counsel, Daniel M. Armstrong, Associate General Counsel, F.C.C., and John J. Powers, III, Atty., Dept. of Justice, Washington, D.C. were on the brief for respondents. George Edelstein, Atty., Dept. of Justice, Washington, D.C., entered an appearance for respondent.

David W. Danner, with whom Andrew Jay Schwartzman, Washington D.C., was on the brief, for intervenor, Consumer Federation of America, et al. Robert M. Gurss, Washington, D.C., entered an appearance, for intervenor.

Michael P. McDonald, was on the brief, for intervenor, American Legal Foundation.

David M. Hunsaker, McLean, Va., was on the brief, for amicus curiae, The Freedom of Expression Foundation, urging the Court to find section 315 as unconstitutional.

Jane E. Kirtley and Elaine P. English, Washington, D.C., were on the brief for amicus curiae, The Reporters Committee for Freedom of the Press, urging the reversal of the F.C.C. decision in this case.

Before BORK and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge BORK.

Concurring opinion filed by Circuit Judge STARR.

BORK, Circuit Judge:

A television news reporter who wishes to run for public office challenges the Federal Communications Commission's decision that the station which employs him would be required to provide "equal time" to his political opponents. This decision would require the station to offer his opponents opportunities to appear on the station that are equivalent to the newscaster's regular daily appearances. The Commission's determination rested on a federal statute. The reporter challenges both the interpretation of the statute and its constitutionality. We deny the petition for review.

## I.

The petitioner, William Branch, is a television reporter who covers general assignments for station KOVR in Sacramento, California. He appears on the air in newscasts, on average, about three minutes per day, reporting stories assigned to him by the station. Branch lives in nearby Loomis, California, a small community of about 4,000 people. Beginning late in 1982, he participated in a successful effort to incorporate Loomis as a town. In 1984 Branch decided to seek election to the new Loomis town council.

Branch was aware that a federal statute —47 U.S.C. § 315(a) (1982)—imposes certain "equal time" burdens on broadcasters. He therefore consulted with station management for advice before commencing his campaign. The KOVR news editors calculated that the station would be required to provide thirty-three hours—or about one and a half broadcast days—of response time to Branch's opponents if he

continued to work there during his campaign.[1] They told Branch that KOVR was unwilling to provide that amount of time to his opponents, and that if he wished to maintain his candidacy he must take an unpaid leave of absence during the campaign, with no guarantee that he would be able to resume his duties after the election.

Branch immediately sought judicial and administrative determination of his rights, but was unable to get a ruling before the 1984 election. Put to a choice, he continued his work at KOVR and dropped out of the town council race. Upon terminating his candidacy, however, he filed a petition for a declaratory ruling from the Commission on the effect of the "equal opportunities" requirement in 47 U.S.C. § 315(a) on newscaster candidates. Branch sought a ruling that would enable him to run for the Loomis town council in a future election without requiring his employer to offer equal time to his opponents. He specifically asked the Commission to rule on two issues: whether the statute required broadcast stations to provide equal time to the opponents of newscaster candidates; and whether the statute was constitutional as so applied.

The Commission denied the petition. After reviewing the language and purposes of the statute, as well as its legislative history, the Commission concluded that newscaster candidates do not come within any special exemption from a station's statutory obligation to provide equal time to other candidates. *In re William H. Branch*, 101 F.C.C.2d 901, 902–04, 906 (1985). The Commission initially refused to review its previous determinations that section 315 is constitutional, mindful "that such constitutional decisions have 'generally been thought beyond the jurisdiction of administrative agencies.'" *Id.* at 904 n. 4 (quoting *Oestereich v. Selective Serv. Bd.*, 393 U.S. 233, 242, 89 S.Ct. 414, 419, 21 L.Ed.2d 402 (1968) (Harlan, J., concurring)). The Commission went on, however, to state that it would defer to Congress' determina-

---

1. This figure, which is not in dispute, was reached by multiplying 11 (the number of Branch's opponents) times 60 days (the approxi- mate number of days in the campaign) times three minutes per day (the approximate number of minutes per day that Branch is on the air).

tion "in enacting section 315 that there is a governmental interest in assuring that licensees afford equitable treatment to all candidates running for a particular office, and that this interest justifies imposing certain limitations on broadcast speech.... [that treat] all candidates for public office ... in the same manner." *Id.* at 904–05. The Commission also ruled that the statute is not unconstitutionally overbroad. *Id.* at 905. Branch's petition for reconsideration was denied by the Commission, and he now seeks review in this court.

## II.

■ The government contends that Branch lacks standing to bring this suit in federal court. In order to establish standing, Branch must allege "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The government correctly notes that these standards remain applicable where the relief sought is merely a declaratory ruling, *see Radiofone, Inc. v. FCC*, 759 F.2d 936, 938–39 (D.C.Cir. 1985), and that the standards are unaffected by the fact that the petitioner was permitted to proceed before the administrative agency, which is not subject to the same jurisdictional limits that article III imposes on the federal courts. *See California Ass'n of the Physically Handicapped v. FCC*, 778 F.2d 823, 826 n. 8 (D.C.Cir.1985).

■ The crucial question is whether Branch has suffered any actual or threatened injury. The government concedes that if Branch could demonstrate that he was likely to lose his job, even temporarily, as a result of becoming a political candidate, he would have standing to seek review of the Commission's decision. Brief for Respondents at 10. Such an injury would be "distinct and palpable," *see Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), and the direct threat of this injury would not vanish merely because in the previous election Branch chose to keep his job and forgo his candidacy. At that point, indeed, the al-

leged injury to Branch simply changed form, possibly becoming even more severe, for "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976).

Branch has adequately demonstrated that he suffered the particular injury just described. In an affidavit attached to his petition for reconsideration of the Commission's decision, Branch affirmed that after he decided to run for town council, he

> consulted with station management for advice. KOVR news editors told [Branch] that he must take an unpaid leave of absence during the campaign with no guarantee of resuming his duties after the election if he were to maintain his candidacy, because of the significant amounts of time that would have to be provided for opponents of a newscaster candidate under the Commission's section 315 rulings. [Branch] declined to run for town council because of this response.

Petition for Reconsideration at 3–4, Joint Appendix ("J.A.") at 83–84; Affidavit of William H. Branch at 1 (Sept. 10, 1985), J.A. at 106. This statement was subsequently confirmed in an affidavit filed with the court by Albert Jaffee, the news director at KOVR. Affidavit of Albert Jaffee at 1–2 (Dec. 12, 1986). These statements are sufficient to establish both that Branch's injury was caused by the Commission's view of the operation of the statute and that it is likely to be redressed by a favorable ruling on his petition. In addition, Branch correctly alleges that the Commission's ruling has a continuing impact on his ability to run for the Loomis town council in a future election. *See* Petition for a Declaratory Ruling *In re William H. Branch*, at 1 (Aug. 30, 1984), J.A. at 28. We therefore hold that Branch has standing to bring this case.

■ One of the intervenors recasts these objections as an argument that the case is not ripe for decision. The contention seems to be that Branch's claim would become ripe if he actually lost his job by

prosecuting a campaign. This is, of course, merely a modified version of the argument that Branch has suffered no injury. It flies in the face of considerable precedent that a federal court may decide not only claims involving actual present injury, but also those involving a threat of injury which is sufficiently direct and immediate to constitute more than a string of contingencies or speculative characterizations. *See, e.g., Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937); *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974); *Laird v. Tatum,* 408 U.S. 1, 11–13, 92 S.Ct. 2318, 2324–25, 33 L.Ed.2d 154 (1972). We also conclude that this case is ripe under the test set out in *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967), which balances the fitness of the issues for resolution against the hardship done to the parties if the court withholds consideration. This case is fit for resolution; we do not believe the issues would be refined by any further development of these facts. On the other hand, the hardship Branch would suffer if we refused to hear his claim, which is the injury we have just described, is obvious.[2]

### III.

Branch initially contends that the statute's "equal time" provisions do not apply to him because the statute exempts the television appearances of a newscaster candidate from their coverage. In matters of statutory construction, we "employ[ ] traditional tools of statutory construction," and "[i]f the intent of Congress is clear, that is the end of the matter." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44 & n. 9, 104 S.Ct. 2778, 2781 & n. 9, 81 L.Ed.2d 694 (1984). The statutory language at issue reads in full:

If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other candidates for the office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provision of this section. No obligation is hereby imposed under this subsection upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—

> (1) bona fide newscast,
>
> (2) bona fide news interview,
>
> (3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or
>
> (4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),

shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

47 U.S.C. § 315(a) (1982). Branch reads the statutory language to mean: the "equal opportunities" requirement applies only when there is a "use" of a broadcasting station; a candidate's appearance on a bona fide newscast does not constitute such a "use"; thus Branch's appearances on KOVR's bona fide news broadcasts are not subject to the "equal opportunities"

---

**2.** We also note in passing that this case is not moot, even though the 1984 town council election has long passed, since Branch seeks to preserve his right to run in a future election by preventing a recurrence of these events. Controversies that arise in election campaigns are unquestionably among those saved from mootness under the exception for matters "capable of repetition, yet evading review." *See, e.g., Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969).

requirement. The apparent simplicity of this argument, however, is misleading.

The statutory language just quoted comprises four sentences. The first two, which contain Congress' statement of the equal opportunities rule, have been in effect since 1927, about as long as the broadcasting industry has existed in this country. *See* Radio Act of 1927, § 18, 44 Stat. 1162, 1170. For thirty-two years, these sentences stood alone as Congress' entire treatment of the issue. During that period, the Commission interpreted the statute to require "equal opportunities" whenever any candidate appeared on the air, unless the candidate was the subject of "a routine news broadcast." *In re Allen H. Blondy*, 40 F.C.C. 284, 285 (1957); *see* Use of Broadcast Facilities by Candidates for Public Office, 23 Fed.Reg. 7817, 7817–18 (1958) (codifying the Commission's determinations of what constitutes a "use").[3] The news broadcast exception that the Commission formulated was understood as preserving for the station "the exercise of its judgment as to newsworthy events." 23 Fed. Reg. at 7818.

Branch does not deny that his on-the-air work as a news reporter would be classified as a "use" if we looked solely at the first two sentences of section 315. His statutory argument rests instead on the third sentence.[4]

Congress added that sentence as well as the fourth to section 315 in 1959. The impetus for the addition was the response to the Commission's ruling in the "Lar Daly" case. *In re Telegram to CBS, Inc.*, 18 Rad.Reg. (P & F) 238 (1959). Lar Daly, a candidate for mayor of Chicago, complained to the Commission about television newscasts that had shown, among other things, interviews of his opponents and a film clip of the incumbent mayor greeting the Argentinean President at the airport. The Commission held that a candidate's appearance on a newscast constituted a "use" of a broadcasting station, and that Daly was entitled to equal time. *Id.* This decision, which upset the Commission's previous balance between a broad definition of the term "use" and freedom for broadcast stations to judge for themselves which events merit news coverage, was severely criticized. On rehearing, the Commission

---

**3.** Among the Commission's prior determinations, which it set out in a question-and-answer format, were the following:

4. Q. If a legally qualified candidate secures air time but does not discuss matters directly related to his candidacy, is this a use of facilities under section 315?
A. Yes. Section 315 does not distinguish between the uses of broadcast time by a candidate, and the licensee is not authorized to pass on requests for time by opposing candidates on the basis of the licensee's evaluation of whether the original use was or was not in aid of a candidacy.

. . . .

6. Q. If a candidate appears on a variety program for a very brief bow or statement, are his opponents entitled to "equal opportunities" on the basis of this brief appearance?
A. Yes. All appearances of a candidate, no matter how brief or perfunctory, are a "use" of a station's facilities within section 315.

. . . .

11. Q. If a station owner, or a station advertiser, *or a person regularly employed as a station announcer were to make any appearances over a station after having qualified as a candidate for public office, would section 315 apply?*
A. *Yes. Such appearances of a candidate are a "use" under section 315.*

23 Fed.Reg. at 7818 (emphasis added). On the last answer, the Commission cited its earlier ruling that found the work done by a radio announcer to be a "use." *See* In re Kenneth E. Spengler, 14 Rad.Reg. (P & F) 1226b (1957). The Commission also noted its decision in *Blondy*, 23 Fed.Reg. at 7818.

**4.** In a 1965 decision, for example, the Commission explicitly construed the structure of the full text of amended section 315 in this same manner:

Prior to the amendment to Section 315 in 1959, the Commission held that generally any appearance[s] of a person regularly employed as a station announcer after having qualified as a candidate for public office were "uses" of the station facilities within the meaning of Section 315. There has been no showing that this general line of rulings would be inapplicable to this situation (where the newscaster was identified up to the date of his candidacy, and prepares and broadcasts the news, including that of a local nature). The critical consideration is whether the 1959 amendment to Section 315 is applicable and calls for a different result.

Use of Station by Newscaster Candidate, 40 F.C.C. 433, 433 (1965).

frankly recognized that the ruling was troublesome, yet thought itself bound to uphold it:

> It may, of course, seem that such a holding is harsh or unduly rigid and that within the area of political broadcasts, it has a tendency to restrict radio and television licensees in their treatment of campaign affairs. If this be so, the short answer is that such a result follows not from any lack of sympathy on our part for the problems faced by licensees in complying with section 315, but from the unconditional nature of the language of section 315, which we are not at liberty to ignore.

*In re CBS, Inc.*, 26 F.C.C. 715, 743 (1959).[5]

Congress immediately decided to "write back into Section 315 this traditional exemption from the equal-time requirement and to deal with other things that have always been thought to be exempted from the equal-time requirement." 105 Cong. Rec. 16,229 (1959) (Rep. Harris). Within three months the last two sentences of section 315 were enacted. *See* Communications Act Amendments of 1959, Pub.L. No. 86–274, § 1, 73 Stat. 557, 557.

The legislative history of the 1959 amendments conclusively establishes three critical and overlapping points. First, Congress' central concern in taking action was to overrule the Commission's *Lar Daly* decision. *E.g.*, S.Rep. No. 562, 86th Cong., 1st Sess. 2–10 (1959) U.S.Code Cong. & Admin.News 2564, 2565–2572; *id.* at 14 (additional views of Sen. Hartke) ("All of us agree on the importance of reporting a bill to reverse the *Lar Daly* decision."); H.R.Rep. No. 802, 86th Cong., 1st Sess. 2–4 (1959); *id.* at 18 (supplemental views of Reps. Mack & Hemphill) ("This legislation is a result of the clamor which followed that decision.").[6] This concern was so important and so immediate that Congress was unwilling even to wait for that decision to be considered by the courts on appeal. *See, e.g.*, H.R.Rep. No. 802, *supra*, at 4; 105 Cong.Rec. 16,230 (1959) (Reps. Harris & Pucinski); *id.* at 16,236 (Rep. Flynt).

Second, the purpose of overruling *Lar Daly* was to restore the understanding of the law that had prevailed previously. *E.g.*, S.Rep. No. 562, *supra*, at 2–6, 17–19 U.S.Code Cong. & Admin.News at 2565–2570, 2579–2581; H.R.Rep. No. 802, *supra*, at 2–3.[7] That understanding, as we have

**5.** While acknowledging that "news presentation by radio and television stations is of inestimable value to the public interest," the Commission reaffirmed that "when a station uses film clips showing a candidate during the course of a newscast, that appearance of a candidate can reasonably be said to be a use within the meaning and intent of section 315." 26 F.C.C. at 742–43.

**6.** *See* 105 Cong.Rec. 14,440 (1959) (Sen. Pastore) ("We are merely writing into section 315 an exemption which will take care of the very ridiculous situation which is presented because of the Lar Daly decision."); *id.* at 14,450 (Sen. Engle) ("We propose to reverse the Daly case."); *id.* at 14,452 (Sen. Keating) (the amendments "attempt to remedy the rather ridiculous result achieved in the Lar Daly case"); *id.* at 16,224 (Rep. Budge) (this legislation "is most necessary" to correct "the impossible situation" created by *Lar Daly* ); *id.* at 16,225 (Rep. Brown) ("This legislation has been drawn carefully ... just to meet" the *Lar Daly* ruling that "just does not make good, common sense."); *id.* at 16,230 (Rep. Harris) ("the crucial thing in this legislation" is "to overrule the *Lar Daly* decision"); *see also id.* at 14,440 (Sen. Douglas); *id.* at 14,443 (Sen. Holland); *id.* at 14,445 (Sen. Case); *id.* at 14,446 (Sen. McNamara); *id.* at 14,453 (Sen.

Javits); *id.* at 16,224 (Rep. Bolling); *id.* at 16,226 (Rep. Hoffman); *id.* at 16,228 (Rep. McCormack); *id.* at 16,232 (Rep. May); *id.* at 16,233 (Rep. Avery); *id.* at 16,234–35 (Rep. Rogers); *id.* at 16,237 (Rep. Jones); *id.* at 16,240 (Rep. Cunningham); *id.* at 16,241 (Rep. Bennett); *id.* at 16,244 (Rep. Quigley).

**7.** *See* 105 Cong.Rec. 14,442 (1959) (Sen. Pastore) ("For almost 32 years we have lived in a situation in which the decision in the Daly case was not operative. But last February the Commission rendered a very ridiculous decision which requires that an amendment be made to the law."); *id.* at 14,450 (Sen. Engle) ("[W]e have had something like 32 years of experience with the law, and we have had no trouble with it at all.... It was not until February of this year, when the FCC issued its stupid, silly decision in the Lar Daly case, that we were confronted with any trouble."); *id.* at 14,455 (Sen. Pastore) ("Generally all we are doing is restoring the situation insofar as news is concerned to that which existed for 32 years, before the Lar Daly decision."); *id.* at 16,227 (Rep. Celler) (this bill "restores the status quo before the Lar Daly decision"); *id.* at 16,234 (Rep. Avery) (this bill restores "the end that is sought and was accepted in the industry before the Lar Daly deci-

noted, required "equal opportunities" whenever any candidate appeared on the air, unless the candidate was the subject of "a routine news broadcast." *See, e.g.,* 105 Cong.Rec. 14,454 (1959) (Sen. Pastore) ("The only trouble is that the Commission, which had sustained the position under the Blondy case, then last February under the Lar Daly case swung completely to the other side."); *id.* at 16,229 (Rep. Harris) ("primary purpose of this legislation" is to reverse *Lar Daly* and restore *Blondy* and "this traditional exemption from the equal-time requirement"); *id.* at 16,235–36 (Rep. Rogers) (*Daly* is inconsistent with *Blondy,* which was "a realistic and practical result in the public interest").

Third, Congress objected to the imposition of "equal opportunities" obligations on any station that carried news coverage of a candidate, because it deterred the broadcast media from providing the public with full coverage of political news events, and many other news events as well. *E.g.,*

S.Rep. No. 562, *supra,* at 9–10, 13, 14 U.S. Code Cong. & Admin.News at 2571–2573, 2575–2577; H.R.Rep. No. 802, *supra,* at 4–5.[8] To the extent that Congress may have done more than reverse *Lar Daly,* by exempting broadcast coverage of news interviews and news documentaries in addition to newscasts and on-the-spot coverage of news events, it did so to protect a station's ability to exercise broad discretion in choosing which *newsworthy events* to present to the public. *E.g.,* S.Rep. No. 562, *supra,* at 10–11, U.S.Code Cong. & Admin. News at 2572–2574 (concern is about "news and information-type programs" that "serve to enlighten the public"); H.R.Rep. No. 802, *supra,* at 4–5 ("broadcasters must be given freedom to exercise their news judgment in permitting candidates to appear in newscasts" and showing candidates "involved in news events"); *id.* at 6 ("in order not to be considered use of a station, the event to be covered in a newscast must be news in and of itself").[9]

sion"); *id.* at 16,236 (Rep. Mack) (the bill will "restore a situation which had existed since 1927 when the original act was passed"); *id.* at 16,237 (Rep. Harris) (the committee's intention was "to restore the original intent of the Congress and the original interpretation of this basic law"). A proposal was also made in the Senate to exempt candidate appearances on "panel discussions," which would have been a considerable shift from the state of the law before *Lar Daly,* but it was rejected. *See id.* at 14,450–53.

**8.** *See also, e.g.,* 105 Cong.Rec. 14,439 (1959) (Sen. Pastore) (the alternative to this bill is "a blackout in the presentation of legally qualified candidates in the news type programs"); *id.* at 14,446 (Sen. McNamara) (if *Lar Daly* stands, "effective radio and television news coverage of elections would be seriously jeopardized"); *id.* at 14,447 (Sen. Hartke) ("The ruling severely restricts the opportunity of the people to know what is going on."); *id.* at 14,451 (Sen. Holland) (these amendments allow broadcasters "to cover the political news to the fullest degree"); *id.* at 16,226 (Rep. Celler) ("The overriding consideration in these circumstances is that passage of the pending measure is urgently needed to protect the public's right to know."); *id.* at 16,240 (Rep. Cunningham) (*Lar Daly* placed "a news gag ... on the entire broadcasting industry"); *id.* at 16,242 (Rep. Stratton) ("without the kind of clarification provided in this legislation fair and adequate coverage of the news may be seriously impaired"); *id.* at 16,246 (Rep. McGovern) ("as matters now stand, it will be virtu-

ally impossible for radio and television stations to offer adequate news coverage").

**9.** *See also, e.g.,* 105 Cong.Rec. 14,443 (1959) (Sen. Holland) (the proposed exemption is confined to "a field of items which are either newsworthy or are so close to news as to be properly excepted"); *id.* at 14,446 (Sen. McNamara) (the amendments leave "the control of news coverage of politics in the hands of the broadcasters"); *id.* at 14,450 (Sen. Engle) (A candidate "is entitled to appear on television" if his action "is a newsworthy event.... News is a self-limiting factor."); *id.* at 16,225 (Rep. Brown) (amendments apply to a candidate who is the subject of coverage "where it is legitimate news, or the coverage of a legitimate news event"); *id.* at 16,227 (Rep. Celler) (this bill safeguards "the right of the American citizenry to obtain at first hand newsworthy events treated in political campaigns"); *id.* at 16,236 (Rep. MacDonald) (The *Daly* ruling "destroys the program editor's freedom of judgment as to what is news and what is not. Newscasters should not be restrained against the public interest in proper judgment of what is news."); *id.* at 16,244 (Rep. Moss) ("a news development ... showing the candidate making his newsworthy statement" would be exempt).

Some Representatives and Senators were concerned, however, that a station's broad discretion in choosing which news events to present could allow favoritism and discrimination in portraying candidates. This concern was addressed by continued recognition in the fourth

Thus Congress' intent in enacting the amended section 315 is readily discernible. "Appearance by a legally qualified candidate," which is not "deemed to be use of a broadcasting station," is coverage of the candidate that is presented to the public as news. The "appearance" of the candidate is itself expected to be the newsworthy item that activates the exemption. "By modifying all four categories [not deemed to be 'use' with the phrase 'bona fide,' Congress plainly emphasized its reliance on newsworthiness as the basis for an exemption." *Office of Communication of the United Church of Christ v. FCC*, 590 F.2d 1062, 1065 (D.C.Cir.1978).

The thrust of the language is brought out further in the third and fourth specific exemptions. The "news documentary" exemption applies only "if the appearance of the candidate is incidental to *the presentation of the subject or subjects covered by the news documentary.*" 47 U.S.C. § 315(a)(3) (1982) (emphasis added). This passage relates the candidate's appearance to the subjects covered in the program. If the candidate's appearance has nothing to do with the subjects that are being covered as news—whether because the candidate is a regular employee on all such programs or, to take another example, because the candidate is being offered a gratuitous appearance that realistically is unrelated to the news content of the program—then the exemption does not apply. Similarly, the fourth exemption for "on-the-spot coverage" of news applies only to "coverage of bona fide news events." *Id.* § 315(a)(4). Here again the focus is on a news *event* that is being covered, with the candidate's appearance expected to occur as part of the event *being covered.*

When a broadcaster's employees are sent out to cover a news story involving other persons, therefore, the "bona fide news event" is the activity engaged in by those other persons, not the work done by the employees covering the event. The work done by the broadcaster's employees is not a part of the event, for the event would occur without them and they serve only to communicate it to the public. For example, when a broadcaster's employees are sent out to cover a fire, the fire is the "bona fide news" event and the reporter does not become a part of that event merely by reporting it. There is nothing at all "newsworthy" about the work being done by the broadcaster's own employees, regardless of whether any of those employees happens also to be a candidate for public office.

This reading of the statute as not exempting newscasters is also compelled by the weight of the legislative history. As we have said, Congress' intent in the 1959 amendments was to return the industry to the situation that had prevailed before *Lar Daly.* The status quo before *Lar Daly* allowed a candidate to appear on the air as the *subject* of "routine" news coverage without triggering the "equal opportunities" rule, *see Blondy*, 40 F.C.C. at 285, but did not exempt appearances by a candidate who is "regularly employed as a station announcer." *See* 23 Fed.Reg. at 7818; *In re Kenneth E. Spengler*, 14 Rad.Reg. (P & F) 1226b (1957). Nowhere in the legislative history is there the slightest indication that Congress intended, for the first time, to sweep the latter class of appearances within the scope of the exemption.

Moreover, Congress' objection to *Lar Daly* was that it discouraged wide broadcast coverage of political news events by restricting a station's ability to determine which news *events* to present to the public. Congress solved this problem by exempting any on-air appearance by a candidate who is the *subject* of news coverage. It is irrelevant to that problem whether a station has broad discretion to determine which of its employees will actually present the news on the air. That issue may raise very different problems, which we will consider later,[10] but it did not arise at all in Congress' debates on the 1959 amend-

---

sentence of § 315 that broadcasters operate in the public interest, a broad obligation that the Commission enforces more specifically. *See Telecommunications Research & Action Center*

*v. FCC*, 801 F.2d 501 (D.C.Cir.), *reh'g denied*, 806 F.2d 1115 (1986).

**10.** *See infra* section IVC.

ments. On the contrary, considerable concern was voted about the possibility that "sham" news events—events that are not bona fide news but are staged by the candidate—might be seen as exempt from the "equal opportunities" rule. *See, e.g.,* H.R. Rep. No. 802, *supra,* at 6; 105 Cong.Rec. 14,462 (1959) (Sen. Long) (the amendments apply to a candidate "when he was making news"); *id.* at 16,236 (Rep. MacDonald) ("staged events ... should not be viewed as news"). This possibility was eventually foreclosed, however, by the wording of the fourth exemption. In denying any exemption for candidate appearances through "sham" news events, Congress once again expressed its view that exemption should be made only for on-air appearances that are intrinsically newsworthy. At all times, the focus was not on preserving anyone's "right" to appear on the air, but on preserving broadcasters' ability to present to the public certain kinds of news programs and news events.[11]

In opposition to that consistent approach, Branch asks this court to read the phrase "[a]ppearance by a legally qualified candidate on any [news program]" as exempting from the "equal opportunities" rule all on-air work done by newscaster candidates. We cannot do so. As we have already noted, such a reading would be at odds with the law before *Lar Daly,* which Congress explicitly sought to restore through the 1959 amendments. In addition, this reading would raise a station's news employees to an elevated status not shared by any of its other employees: although the work done on the air by any other employee on any other program would not be exempt, *see, e.g., Paulsen v. FCC,* 491 F.2d 887 (9th Cir.1974), the work done on the air by news employees would be. Yet this

novel division was never endorsed, or even discussed, by Congress.

Finally, Branch argues that the Commission's position in this case is inconsistent with the position it took in a 1960 ruling, which was upheld on appeal. *See In re KWTX,* 40 F.C.C. 304, *aff'd sub nom. Brigham v. FCC,* 276 F.2d 828 (5th Cir.1960) (per curiam). We think, however, that these decisions were wrong, and do not reflect a proper interpretation of section 315. In *KWTX,* the Commission held that the "equal opportunities" rule was not applicable to the on-air appearances of a weatherman. *See* 40 F.C.C. at 304–05. In its ruling, however, the Commission merely stated this conclusion without providing any analysis of the statutory language or any mention of the legislative history. The Fifth Circuit's brief per curiam affirmance did set out the statutory language, but disposed of the issue in a single paragraph. *See* 276 F.2d at 830. It also did not mention the legislative history, but focused instead on the fact that no favoritism by the station had been shown. *See id.*

Five years later, however, the Commission revisited this issue. *See Use of Station by Newscaster Candidate,* 40 F.C.C. 433 (1965). The Commission stated: "In view of the frequency with which these situations have arisen, we have re-examined the question of the applicability here of the 1959 amendment, and have researched at length the legal and legislative history considerations." *Id.* at 434. Based on its more detailed consideration of the matter, the Commission reversed its position and concluded that the 1959 amendments did not apply to exempt newscaster candidates from the "equal opportunities" rule. Its stance has remained unchanged ever since that decision.

11. The Commission's subsequent interpretations of § 315 to allow an exemption from the "equal opportunities" rule for coverage of candidates in debates initiated by nonbroadcasters, *see* In re Aspen Inst., 55 F.C.C.2d 697 (1975), *aff'd sub nom. Chisholm v. FCC,* 538 F.2d 349 (D.C.Cir.), *cert. denied,* 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976), in delayed broadcasts of political events, *see* In re Delaware Broadcasting Co., 60 F.C.C.2d 1030 (1976), *aff'd sub nom. Office of Communication of the United Church*

of Christ v. FCC, 590 F.2d 1062 (D.C.Cir.1978), and in debates initiated by broadcasters, *see* In re Henry Geller, 95 F.C.C.2d 1236 (1983), *aff'd mem. sub nom. League of Women Voters Educ. Fund v. FCC,* 731 F.2d 995 (D.C.Cir.1984), are harmonious with Congress' intent to ensure that the public will have access to a broad array of newsworthy events. But none of these interpretations can be used to justify an exemption for newscaster candidates who are not the subjects of news coverage during their time on the air.

We agree, therefore, that the Commission has not always taken the same position on this issue. If the question for this court were how much deference to give to the Commission's views, this change of heart might offer slender support for Branch's position. *See, e.g., FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 45, 70 L.Ed.2d 23 (1981). On the other side, of course, would be the more substantial facts that the Commission changed its position upon fuller consideration of the issue for a very good reason, and has faithfully adhered to its current position for more than twenty years. But in the first instance, always, the question for a court is not how much deference to give to an agency's interpretation of a statute, but whether that interpretation is correct. *See Chevron,* 467 U.S. at 843 & n. 9, 845, 104 S.Ct. at 2781 & n. 9, 2783. On the issue of statutory construction raised here, we think the Commission's current position is correct, and Congress' intent is clear. The weight of the legislative history, indeed, is overwhelming. No tribunal that has considered the language of section 315 in light of its legislative history has ever endorsed Branch's reading of the statute, and we also reject it.[12]

## IV.

We have determined that section 315 does not exempt newscaster candidates from the strictures of the "equal opportunities" rule. Branch challenges the statute, as so interpreted, on several constitutional grounds. Common to all of the challenges is Branch's assertion that the Commission acted arbitrarily and capriciously by initially refusing "to undertake a review here of previous determinations as to the constitutionality of section 315." *Branch,* 101 F.C. C.2d at 904 n. 4. The Commission did not err in taking this position, for although an administrative agency may be influenced by constitutional considerations in the way it interprets or applies statutes, it does not have jurisdiction to declare statutes unconstitutional. *See e.g., Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975); *Johnson v. Robison,* 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1974); *Public Utils. Comm'n v. United States,* 355 U.S. 534, 539, 78 S.Ct. 446, 450, 2 L.Ed.2d 470 (1958). In addition, the Commission did consider Branch's constitutional arguments insofar as they had a bearing on its own interpretation and application of section 315. *See Branch,* 101 F.C.C.2d at 904–05. We think this approach was entirely proper,[13] and we turn now to Branch's substantive challenges to the constitutionality of section 315.

## A.

Branch's first objection is that the statute extinguishes his right to seek political office. That he has such a right is undeniable, though the Constitution and the Supreme Court's cases in the area do not pinpoint the precise grounds on which it rests. *See, e.g., Jenness v. Fortson,* 403 U.S. 431, 438–40, 91 S.Ct. 1970, 1974–75, 29

---

**12.** In light of Judge Starr's concurrence, we wish to specify one point. We do not believe that the language of the statute, taken alone, is unambiguous on this issue. We do believe, however, that when we "employ[ ] traditional tools of statutory construction," and inform our reading of the statute by an examination of its legislative history, "the intent of Congress is clear." *Chevron,* 467 U.S. at 843–44 & n. 9, 104 S.Ct. at 2781 & n. 9. We therefore do not continue on to consider the reasonableness of the agency's position. *See id.* at 844 n. 9, 104 S.Ct. at 2781 n. 9 ("If the intent of Congress is clear, that is the end of the matter.").

**13.** This court's recent decision in *Meredith Corp. v. FCC,* 809 F.2d 863 (D.C.Cir.1987), a challenge to the constitutionality of continued enforcement of the Commission's fairness doctrine, bears out the soundness of the Commission's approach here. In *Meredith,* we reversed the Commission because it had refused to consider constitutional issues that were raised as a defense to an enforcement proceeding. But we specifically recognized that although the Commission may be influenced by constitutional considerations in the way it interprets and applies statutes, it is "not free to declare an act of Congress unconstitutional," *id.* at 872, and we cautioned that "[i]f the Commission had concluded that the [fairness] doctrine was congressionally mandated and properly applied to Meredith, it would, as we have indicated, not have been obliged to reach the constitutional question." *Id.* at 873 n. 11.

L.Ed.2d 554 (1971); *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974); *Bullock v. Carter,* 405 U.S. 134, 142–43, 92 S.Ct. 849, 855, 31 L.Ed.2d 92 (1972); *cf. Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968).[14] But whatever its source, the right is not implicated in this case. "In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Bullock,* 405 U.S. at 143, 92 S.Ct. at 856. Here that impact is slight. The "equal opportunities" rule does not extinguish anyone's right to run for office. It simply provides that certain uses of a broadcast station by a candidate entitle other candidates for the same office to equal time. That the rule will affect some candidates favorably and others unfavorably is obvious. It may cause certain candidates to receive less time on the air than if the statute did not exist. But the Supreme Court has held that no individual has any right of access to the broadcast media. *Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). "It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969).

■ The core of Branch's challenge on this point is that the statute imposes an undue burden on his ability to run for office because he cannot, during the time he is a candidate, do his normal work of reporting news on the air for station KOVR. But nobody has ever thought that a candidate has a right to run for office and at the same time to avoid all personal sacrifice. *See United States Civil Serv.*

*Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973) ("Neither the right to associate nor the right to participate in political activities is absolute in any event."). Even if the practicalities of campaigning for office are put to one side, many people find it necessary to choose between their jobs and their candidacies. The Hatch Act requires government employees to resign from work if they wish to run for certain political offices, *see* 5 U.S.C. §§ 7324–7327 (1982), and involves many more intrusive restrictions as well, yet the Supreme Court has upheld it against constitutional challenge. *See Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796; *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). More recently, the Court upheld a Texas law that required certain public officials to resign from office if they wished to become candidates for certain other offices. *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982).

Indeed, the burdens Branch complains of are borne by all other radio and television personalities under section 315, though the exception he seeks would apply only to newscasters. In *Paulsen v. FCC,* 491 F.2d 887 (9th Cir.1974), those burdens were upheld against essentially the same objection made here. The petitioner, a television performer who had announced his candidacy for President, contended that section 315 "forces him to give up his means of livelihood as a television performer in order to run for office." *Id.* at 891–92. In *Paulsen* the challenge was clothed in an equal protection guise, and perhaps at bottom Branch's challenge is also one of equal protection. However that may be, the argument is the same, and so is the result.

14. Other cases cited by the petitioner do not concern a right to run for political office, but instead the right to be free from government action that violates other express constitutional restrictions. The Supreme Court has recognized that American citizens "do have a federal constitutional right to be considered for public service without the burden of discriminatory disqualifications. The State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." *Turner v. Fouche,* 396 U.S. 346, 362–63, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970) (footnotes omitted). *See also McDaniel v. Paty,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (restriction on political activity of ministers violates free exercise of religion); *Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (religious oath test for political office violates free exercise clause).

Under established law, *Paulsen* was correct in finding the burdens imposed by section 315 justifiable as "both reasonable and necessary to achieve the important and legitimate objectives of encouraging political discussion and preventing unfair and unequal use of the broadcast media." *Id.* at 892.

### B.

█ Branch's second constitutional objection to section 315 is that the "equal opportunities" rule violates the first amendment. He cites *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), where the Supreme Court unanimously struck down a Florida law that gave political candidates a right to reply to criticisms and attacks published in newspapers. The Court held that the law compelled editors or publishers to publish material against their will, thus exacting an unconstitutional "penalty on the basis of the content of a newspaper." *Id.* at 256, 94 S.Ct. at 2839. The Court broadly declared that a "[g]overnment-enforced right of access inescapably 'dampens the vigor and limits the variety of public debate.'" *Id.* at 257, 94 S.Ct. at 2839 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964)). The "equal opportunities" rule, in Branch's view, is identical to a right-of-reply statute in its impact.

The Supreme Court has expressly held, however, that the first amendment's protections for the press do not apply as powerfully to the broadcast media. In *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Court upheld the government's authority "to put restraints on licensees in favor of others whose views should be expressed on this unique medium." *Id.* at 390, 89 S.Ct. at 1806. What makes the broadcast medium unique, in the Court's view, is the scarcity of broadcast frequencies. *Id.* at 389–90, 89 S.Ct. at 1806.

While doubts have been expressed that the scarcity rationale is adequate to support differing degrees of first amendment protection for the print and electronic media, *see, e.g., Telecommunications Research & Action Center v. FCC*, 801 F.2d 501, 506–09 (D.C.Cir.), *reh'g denied*, 806 F.2d 1115 (1986); *Meredith Corp. v. FCC*, 809 F.2d 863, 866–67 (D.C.Cir.1987), it remains true, nonetheless, that Branch's first amendment challenge is squarely foreclosed by *Red Lion*. In *Red Lion*, the Supreme Court upheld as constitutional the Commission's authority to enforce the fairness doctrine, which requires broadcast stations to give fair coverage to each side of a public issue, and in particular upheld "its specific manifestations in the personal attack and political editorial rules." 395 U.S. at 386, 89 S.Ct. at 1804. In the course of its opinion, the Court held that the statutory "equal opportunities" rule in section 315 and the Commission's own fairness doctrine rested on the same constitutional basis of the government's power to regulate "a scarce resource which the Government has denied others the right to use":

> In terms of constitutional principle, and as enforced sharing of a scarce resource, the personal attack and political editorial rules are indistinguishable from the equal-time provision of § 315, a specific enactment of Congress requiring stations to set aside reply time under specified circumstances and to which the fairness doctrine and these constituent regulations are important complements. That provision, which has been part of the law since 1927, Radio Act of 1927, § 18, 44 Stat. 1170, has been held valid by this Court as an obligation of the licensee relieving him of any power in any way to prevent or censor the broadcast, and thus insulating him from liability for defamation. The constitutionality of the statute under the First Amendment was unquestioned. *Farmers Educ. & Coop. Union v. WDAY*, 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959).

*Id.* at 391, 89 S.Ct. at 1807 (footnote omitted). *Red Lion* thus compels us to reject Branch's first amendment claim.

Nor can we adopt Branch's suggestion that this court would be justified in stepping away from *Red Lion*. The Supreme Court recently reaffirmed *Red Lion* and

disavowed any intention "to reconsider our longstanding approach without some signal from Congress or the FCC that technological developments have advanced so far that some revision of the system of broadcast regulation may be required." *FCC v. League of Women Voters of Cal.,* 468 U.S. 364, 376 n. 11, 104 S.Ct. 3106, 3116 n. 11, 82 L.Ed.2d 278 (1984). The Commission may now have sent just such a signal by issuing a report which concludes that section 315 is unconstitutional and should be abandoned. *See General Fairness Doctrine Obligations of Broadcast Licensees,* 102 F.C. C.2d 143 (1985).[15] But unless the Court itself were to overrule *Red Lion,* we remain bound by it.

### C.

■ Branch's final constitutional challenge to section 315 is that it impermissibly limits the discretion of broadcast stations to select the particular people who will present news on the air to the public. Branch thus attempts to press the third-party rights of broadcasters who are not themselves parties to this case. Although the general rule is that a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), the Supreme Court has also stated that "[w]ithin the context of the First Amendment, the Court has enunciated ... concerns that justify a lessening of prudential limitations on standing." *Secretary of State v. J.H. Munson Co.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984); *see also Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

Here, as in *Munson,* the "activity sought to be protected is at the heart of the business relationship between" Branch and KOVR, and Branch's "interests in challenging the statute are completely consistent with the First Amendment interests of the [broadcasters he] represents." 467 U.S. at 958, 104 S.Ct. at 2848. It makes no difference that a broadcaster could bring this challenge in a separate suit. *Id.* at 957–58, 104 S.Ct. at 2847.

Nonetheless, the third-party challenge Branch advances is rebutted by *Red Lion.* A burden on the ability to present a particular broadcaster on the air, which applies to all broadcasters irrespective of the content of the news they present, is a much less significant burden than rules requiring the transmission of replies to personal attacks and political editorials, which were upheld in *Red Lion.* The latter provisions apply directly to political speech, and weigh more heavily on some messages than on others, depending on the precise content of the message conveyed. In contrast, the burdens on broadcasters that Branch asserts here do not "impair the discretion of broadcasters to present their views on any issue or to carry any particular type of programming." *Columbia Broadcasting System, Inc. v. FCC,* 453 U.S. 367, 396–97, 101 S.Ct. 2813, 2830, 69 L.Ed.2d 706 (1981). Moreover, we note again that there is no right of any particular individual to appear on television. *See, e.g., Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 113, 93 S.Ct. 2080, 2091, 36 L.Ed.2d 772 (1973).

The petition for review is, therefore,

*Denied.*

STARR, Circuit Judge, concurring:

Although I concur in the court's judgment and much of its thorough opinion, I

---

**15.** In its report, the Commission found that "the various print and electronic media exist in a widely diverse and competitive information marketplace." *See General Fairness Doctrine Obligations,* 102 F.C.C.2d at 202; *see also id.* at 198–202. It also exhaustively canvassed the significant and growing contributions to this market of cable television, low power television multichannel multipoint distribution service,

video cassette recorder, satellite master antennae systems, and other electronic media, including recent advancements in satellite technology. *See id.* at 208–17. When all of these technologies are taken into account, "the overall number of broadcast frequencies exceeds the total number of daily newspapers in the United States." *Id.* at 217.

write separately to express a different perspective about the case, and especially the extent to which the Federal Communications Commission's interpretation is mandated by the statute. Briefly stated, I believe the statute more naturally lends itself to petitioner's interpretation, but that Congressional intent is insufficiently clear to overturn the Commission's contrary reading.

The issue before us is the meaning of the "equal opportunities" requirement of section 315(a) of the Federal Communications Act, 47 U.S.C. § 315(a) (1982). As the court indicates, two of the four sentences of section 315(a) are of particular relevance here. The first sentence sets forth the "equal opportunities" requirement:

> If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section.

*Id.* § 315(a). The third sentence then provides exemptions from the strictures mandated by the first sentence:

> Appearance by a legally qualified candidate on any—
>
> (1) bona fide newscast,
>
> (2) bona fide news interview,
>
> (3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or
>
> (4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),
>
> shall not be deemed to be use of a broadcasting station within the meaning of this subsection.

*Id.*

Section 315(a) is thus crystal clear: bona fide newscasts are exempt from its "equal opportunities" requirement. Since in this case there is no question but that Mr.

Branch in reporting his three-minute news segments appears on a bona fide newscast, his appearance would not be deemed a use of a broadcasting station under a straightforward reading of section 315(a).

As the court acknowledges, the Fifth Circuit recognized the force of this common-sense interpretation in *Brigham v. FCC,* 276 F.2d 828 (5th Cir.1960). In *Brigham,* the court upheld the Commission's determination (later repudiated, *see Use of Station by Newscaster Candidate,* 40 F.C.C. 433 (1965)) that a weathercaster's appearance fell within the "bona fide newscast" exemption of section 315(a)(1). The Fifth Circuit stated with admirable brevity:

> There is not the slightest hint in the undisputed facts that this weathercaster's appearance involved anything but a bona fide effort to present the news. … [H]is employment is not something arising out of the election campaign but, rather, is a "regular job." Certainly the facts do not indicate any favoritism on the part of the station licensee or intent to discriminate among candidates.

*Brigham,* 276 F.2d at 830.

Eschewing *Brigham's* simplicity, the court examines in detail the legislative history of the 1959 amendments that created the section 315(a) exemptions. *Cf. Burlington Northern Railroad Co. v. Oklahoma Tax Commission,* — U.S. ——, 107 S.Ct. 1855, 1859–60, 95 L.Ed.2d 404 (1987). After a careful evaluation of the legislative materials, the court quite rightly concludes that Congress, in enacting the exemptions, intended to protect broadcast stations' discretion to air newsworthy events. *See* Panel Op. *supra* at 44.

From that unexceptionable premise, however, the court derives the general principle that Congress intended the exemption to extend only to "coverage of the candidate that is presented to the public as news." Panel Op. *supra* at 45. But there is a difficulty with this analysis. Through its finely-honed construction of the third sentence of the statute, the court moves rather far away from the key language of the first sentence of section 315(a), namely "permit"

and "use." When a newscaster reports the news, there is no "use" or "permitting" of a use in the ordinary sense of those words. Employers do not "permit" their employees to "use" broadcast facilities. Employees are *hired* to do their jobs. Once on the payroll, they have to carry on their duties; there is no "permission" being granted in the everyday sense of the word. The thrust of the first sentence, in short, is to regulate broadcaster favoritism and candidate-initiated appearances, which is what *Brigham* held.

For these reasons, a more natural statutory interpretation would exempt newscast reporters who are just doing their jobs from the "equal opportunities" requirement of section 315(a). But, unfortunately for Mr. Branch, the most natural reading is not the only reading that will pass muster under governing principles of statutory construction. What is more, as the court faithfully recounts, the legislative history contains suggestions that Congress adopted the 1959 amendments in order to restore the understanding of the law that had prevailed prior to the Commission's ill-fated *Lar Daly* decision. Panel Op. *supra* at 43–44 & n. 7. Since that pre-*Lar Daly* body of law included the principle that a newscaster's appearance was indeed a "use" within section 315(a), *see* 23 Fed.Reg. 7817, 7818 (1958), it is not unfair to conclude that the legislative history adds an additional dash of uncertainty in the search for Congress' intent. That Congressional intent is ambiguous is, of course, quite a different matter than concluding, as the court apparently does, that Congress clearly intended to exclude newscasters from the exemptions.

It is thus the ambiguity of the Legislature's intent, not the supposed crystalline clarity of the statute (and legislative history), that in my view carries the day for the Commission. Under *Chevron* principles, courts are, of course, bound to defer to an agency's reasonable interpretation of its governing statute if Congress' intent is unclear. *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *cf. INS v. Cardoza-Fonseca*, — U.S. —, 107 S.Ct. 1207, 1221–22, 94 L.Ed.2d 434 (1982). In light of

the two permissible readings of the statute and the support that the Commission's interpretation enjoys in the legislative history, the court correctly holds that the Commission's "newscaster candidacy" rule passes muster under *Chevron*. At the same time, however, the Commission is, in my view, by no means bound to its current interpretation, which as I see it embodies the less natural and indeed less sensible reading of what Congress passed.